HILLENMEYER, APPELLANT, *v.* CLEVELAND
BOARD OF REVIEW ET AL., APPELLEES.

[Cite as *Hillenmeyer v. Cleveland Bd. of Rev.,*
144 Ohio St.3d 165, 2015-Ohio-1623.]

---

(No. 2014–0235—Submitted January 14, 2015—Decided April 30, 2015.)

LANZINGER, J.

## INTRODUCTION

{¶ 1} Appellant, Hunter T. Hillenmeyer, a former linebacker for the Chicago Bears of the National Football League ("NFL"), challenges the method by which Cleveland's municipal income tax was imposed on his earnings during tax years 2004, 2005, and 2006. In each of those seasons, the Bears played one game in Cleveland, for which Hillenmeyer was present in Cleveland two days. And for each of those years, the Bears withheld and then paid the municipal tax from his compensation according to Cleveland's allocation method known as "games played," under which the taxable portion of a professional athlete's income is based on the number of games the athlete played in Cleveland in relation to the total number of games played that year.

{¶ 2} As a nonresident of Cleveland, Hillenmeyer asserts that Cleveland has adopted an unlawful method of computing the amount of his compensation that is subject to its city income tax. The games-played method, he argues, dramatically overstates his Cleveland income, because his compensation as an NFL player includes earnings not only for the games he played, but also for the training, practices, strategy sessions, and promotional activities he engaged in.

{¶ 3} On December 19, 2007, Hillenmeyer filed timely applications for refunds of income taxes paid to Cleveland for tax years 2004 through 2006. He appealed the denial of his applications for tax refunds to the city of Cleveland Board of Review, the Board of Tax Appeals ("BTA"), and now this court.

*The issues outstanding*

{¶ 4} Both constitutional and nonconstitutional challenges are levied against the municipal tax: that former R.C. 718.011(B), Am.Sub.S.B. No. 287, 148 Ohio Laws, Part V, 11536,[1] the "occasional entrants" statute, violates both the Ohio Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (proposition of law No. 4); that Cleveland's method of income-tax allocation is contrary to former R.C. 718.01(H), 2007 Am.Sub.H.B. No. 24, and former R.C. 718.03, Am.Sub.H.B. No. 95, 150 Ohio

---

1. In 2014, R.C. Chapter 718 was extensively revised. 2014 Sub.H.B. No. 5. Those revisions became effective March 23, 2015.

Laws, Part I, 396, this court's decision in *Hume v. Limbach,* 61 Ohio St.3d 387, 575 N.E.2d 150 (1991), and Cleveland Codified Ordinances 191.0501(b)(1) (proposition of law No. 1); that the city's method of allocation violates the Due Process Clause of the United States Constitution (proposition of law No. 2); and that it violates the Commerce Clause of the United States Constitution (proposition of law No. 3).

{¶ 5} We now hold that although Cleveland has the right to tax the compensation earned by a nonresident professional athlete for work performed in Cleveland, the city's application of its games-played method of allocating income violates the due-process rights of NFL players such as Hillenmeyer. We reverse and remand for calculation of the tax refund and interest due him.

## FACTUAL BACKGROUND

*Previous proceedings*

{¶ 6} Hillenmeyer filed claims for refunds of Cleveland taxes withheld and remitted for tax years 2004, 2005, and 2006. In his refund applications, he argued that the allocation ratio used by Cleveland was "illegal, erroneous, and unconstitutional" and taxed amounts for services that he performed outside the city.

{¶ 7} The Central Collection Agency ("CCA"), Cleveland's tax administration authority, responded to Hillenmeyer's refund applications by issuing a notice dated January 22, 2008, for each of the tax years, indicating that "[y]our employer withheld the tax correctly." Hillenmeyer then requested that the CCA issue a final, appealable order. On February 19, 2009, the CCA issued a 29–page final dispositional order upholding its imposition of tax using the games-played method of allocation.

{¶ 8} Hillenmeyer appealed the CCA's order to the city's board of review, Cleveland's duly established board for income-tax appeals pursuant to former R.C. 718.11, Am.Sub.H.B. No. 95, 150 Ohio Laws, Part I, 396.[2] A hearing was held on July 2, 2009. Thomas DePaso, associate general counsel of the NFL Players' Association and a former player in the league, testified about Hillenmeyer's employment and compensation, and Hillenmeyer offered into evidence the NFL collective-bargaining agreement and two of his player contracts, the later of which was dated June 29, 2006, and was a six-year contract extending through 2011.

---

2. In Cleveland, the board of review comprises the city's director of public utilities or delegate, the city law director or delegate, and one member of city council elected to the board by the council. Cleveland Codified Ordinances 191.2501.

{¶ 9} On September 29, 2009, the board of review issued a nine-page decision deferring to and upholding the CCA's position. Hillenmeyer then appealed to the BTA. The parties waived a hearing before the BTA and submitted the case on the notice of appeal, the briefs filed, and the record transmitted by the board of review. BTA No. 2009–3688, 2014 WL 351128, *1 (Jan. 14, 2014).

{¶ 10} On January 14, 2014, the BTA issued a decision upholding the board of review's determination. The BTA declined to address Hillenmeyer's constitutional challenges because of its limitations as an administrative tribunal, relying on *Cleveland Gear Co. v. Limbach*, 35 Ohio St.3d 229, 520 N.E.2d 188 (1988), and *MCI Telecommunications Corp. v. Limbach*, 68 Ohio St.3d 195, 625 N.E.2d 597 (1994). BTA No. 2009–3688, 2014 WL 351128, *3. The BTA found that Cleveland's ordinances "do not operate in contravention of any state statute regarding municipal income taxes or Ohio case precedent." (Footnote omitted.) *Id.* But the BTA made "no finding regarding the propriety of the allocation methodology" on the theory that that issue lay outside its jurisdiction. *Id.* Hillenmeyer appealed the BTA's decision to this court.

*Evidence of Hillenmeyer's compensation*

{¶ 11} Because it is necessary to look at Hillenmeyer's total compensation before analyzing the legal issues in this case, we turn to the record, which explains his compensation. Hillenmeyer states in his affidavit to the board of review that he had "been required to provide services to [his] employer from the beginning of the pre-season through the end of the post-season." He had at least 157 work days in 2004, 165 days in 2005, and 168 days in 2006. The affidavit also establishes that in each of those years, "the Chicago Bears played one game in Cleveland, Ohio, traveling to the City the day before the game and leaving the City the same day on which the game was played." Hillenmeyer himself "was present in and rendered services to [his] employer in Cleveland on those two days during each of these years."

{¶ 12} Hillenmeyer's statements were corroborated by the affidavit testimony of Cliff Stein, senior director of football administration and general counsel for the Chicago Bears. Stein confirmed that under the NFL standard player contract and from the time that Hillenmeyer joined the Bears in 2003, he was required to "provide services to his employer from the beginning of the pre-season through the end of the post-season, including mandatory mini-camps, official preseason training camp, meetings, practice sessions, and all pre-season, regular season, and post-season games." Stein also stated that "[t]he compensation Hillenmeyer receives from the Bears is paid for all of these services and not only for games played" and that "[f]ailure to comply with these contractual requirements would subject Hillenmeyer to termination pursuant to Paragraph

12 of his NFL Player Contract and/or fines under Article VIII of the Collective Bargaining Agreement."

{¶ 13} Thomas DePaso testified about Hillenmeyer's contracts, duties, and elements of compensation at the July 2, 2009 hearing. DePaso described the four distinct phases of an NFL player's work year. First, players have the mini camp, a mandatory multiple-day event involving a physical exam, meetings, and practices, which takes place after the NFL draft. Second, the preseason training camp typically lasts about six weeks. Players report two weeks in advance of the first of four preseason games, and days are filled with meetings, practices, reviewing films of previous games, and practicing the plays for upcoming games. The regular season is the third phase, which consists of seventeen weeks—sixteen games with one week off—along with the weekly game-preparation schedule. Usually, players come to work on a Monday, when the injured are treated and others view game films from the weekend. Tuesday is a day off, followed by heavy work days on Wednesday, Thursday, and Friday. Saturday, typically the day before game day, involves a relatively light practice with refinement of game strategy and plays. Finally, the team usually travels on Saturday (if the game is away) and plays on Sunday (unless it is an off week). In a successful year, the team may qualify to play postseason games.

{¶ 14} DePaso also testified about Hillenmeyer's employment contract. Under paragraphs 5 and 6 of the standard player contract, entitled "COMPENSATION" and "PAYMENT," respectively, a certain stated yearly base salary is furnished to the player, paid in weekly or biweekly installments during the regular season. According to DePaso, about 40 percent of the player's compensation is in addition to that baseline amount. Beyond paragraph 5 compensation, players can receive—based on their specific contracts—performance bonuses based on either individual or team performance, signing bonuses, and roster bonuses, which are paid for being a member of the roster on a certain date. Players can be fined for missing mandatory events, and fines may be deducted from their paragraph 5 compensation, but the collective-bargaining agreement imposes caps on the fines. Termination of a player during the season would lead to the prorated forfeiture of the paragraph 5 compensation, but already-earned bonuses such as roster bonuses are fully owed upon termination even if not yet fully paid out.

{¶ 15} Hillenmeyer's June 29, 2006 contract provided for a term covering the 2006, 2007, 2008, 2009, 2010, and 2011 seasons. His paragraph 5 salary began at $585,000 for 2006 and escalated year by year to $1.8 million for 2011. An addendum provided a roster bonus of $4.5 million for 2006, to be paid out in four increments by September 2007. This bonus compensated Hillenmeyer solely for being "a member of the 80–man roster on July 10, 2006," and under the

collective-bargaining agreement the amount was owed and was not forfeitable once earned on that date.

*Games played vs. duty days*

{¶ 16} At the heart of the dispute before us is the method that Cleveland has chosen to allocate the taxable income of nonresident professional athletes. Cleveland imposes a 2 percent tax on the income that is allocable to Cleveland. *See* Cleveland Codified Ordinances 191.0501. CCA Regulation 8:02(E)(6) sets forth a games-played method to allocate the income of a nonresident professional athlete such as Hillenmeyer. This means that Cleveland taxes the one game that Hillenmeyer played in Cleveland each year in proportion to the total number of games the Bears played during the year (approximately 20 preseason and regular-season games in a non-playoff year). Under this methodology, a visiting football player who travels to Cleveland for a single game out of a 20–game season will have one twentieth (5 percent) of his income allocated to Cleveland and then taxed at 2 percent. The Cleveland tax administrator asserts that the games-played method "properly apportions player salaries since the plain language of both [the CBA and the standard player contract] ties a player's contract salary to one thing—games played."

{¶ 17} Nevertheless, except for Cleveland, municipalities that have chosen to tax professional athletes do so on the basis of the allocation offered by Hillenmeyer—the "duty days" approach. In this approach, the numerator represents the number of days spent in the taxing city: in this case, two days for one game. The record shows that Hillenmeyer had 157 duty days in 2004, 165 in 2005, and 168 in 2006. When these numbers are used as the denominators to represent the total number of work days, Cleveland would have been allocated approximately 1.27 percent of Hillenmeyer's income in 2004, 1.21 percent in 2005, and 1.19 percent in 2006. Under the duty-days method, Hillenmeyer claims he is entitled to refunds of $253 for 2004, $359 for 2005, and $4,450 for 2006.

## LEGAL ANALYSIS

*Cleveland's allocation method not prohibited by law*

{¶ 18} Hillenmeyer argues that the method chosen by Cleveland to allocate to itself the income of a nonresident like himself, which is set forth in the CCA Rules and Regulations, conflicts with the underlying tax ordinance passed by the Cleveland City Council.

{¶ 19} Cleveland Codified Ordinances 191.0318 defines "taxable income" as "all qualifying wages, net profits and all other income from whatever source derived set forth in Section 191.0501, and the Rules and Regulations as taxable." The taxing ordinance expressly imposes tax on "all qualifying wages, earned and/or

received * * * by nonresidents of the City for work done or services performed or rendered within the City or attributable to the City," Cleveland Codified Ordinances 191.0501, and it confers authority on the tax administrator to "adopt and promulgate and to enforce and interpret rules and regulations relating to any matter or thing pertaining to the collection of taxes and the administration and enforcement of [the municipal-income-tax ordinances]," subject to approval by the board of review, Cleveland Codified Ordinances 191.2303.

{¶ 20} Thus, the ordinances countenance that regulations will spell out how to apply the standard for taxing nonresidents' income. The ordinances do not restrict how Cleveland's tax administrator may choose to determine the "work done and services performed or rendered within the City or attributable to the City" when, as here, the taxpayer's compensation derives from services performed both within and outside of Cleveland.

{¶ 21} Hillenmeyer also argues that the games-played method violates state law. Former R.C. 718.01(H)(10), 2007 Am.Sub.H.B. No. 24, prohibits municipal taxation of any wages that are not "qualifying wages," which according to former R.C. 718.03(A)(2), Am.Sub.H.B. No. 95, 150 Ohio Laws, Part I, 396, 638, means, as relevant here, "wages, as defined in section 3121(a) of the Internal Revenue Code." The Internal Revenue Code provision defines "wages" generally as "all remuneration for employment," while "employment" in turn is defined as "any service, of whatever nature, performed * * * by an employee for the person employing him." 26 U.S.C. 3121(a), (b).

{¶ 22} From these definitions, Hillenmeyer concludes that Ohio law "requires that employee wages be treated as having been earned for *all* services performed by an employee for his or her employer." (Emphasis sic.) He argues that because the undisputed record established that he performed services for the Bears other than playing in football games, Cleveland's attempt to treat him as being paid only to play in games is contrary to the Revised Code.

{¶ 23} This point has surface appeal. But, just as in the case of the ordinance, R.C. Chapter 718 and the federal definition of wages do not specifically address how to apportion or allocate wage income among the various jurisdictions in which the income has been earned. Municipal home-rule authority to impose taxes may be limited only by a provision of state law that expressly imposes the restriction. *Cincinnati Bell Tel. Co. v. Cincinnati*, 81 Ohio St.3d 599, 605, 693 N.E.2d 212 (1998). The cited statutes do not satisfy this clear-statement rule.

{¶ 24} Nonetheless, although Cleveland's allocation method may not be prohibited by law, we turn to the arguments that it has been unconstitutionally applied to Hillenmeyer.

*No waiver of constitutional claims*

{¶ 25} As a preliminary matter, we resolve the issue of waiver of the constitutional claims. Cleveland faults Hillenmeyer for having appealed to the BTA rather than the common pleas court, where his constitutional issues could have been decided. But Cleveland cites no authority for the supposed obligation to use one appeal avenue as opposed to another. R.C. 5717.011 sets forth an appellant's right to choose the forum and imposes no restrictions on its doing so. We have held that constitutional issues may be raised before the BTA for later determination by the courts on appeal. In such cases, the BTA serves as the forum for presentation of evidence so that a record is available for the court deciding those issues on appeal. *Cleveland Gear Co.*, 35 Ohio St.3d at 232, 520 N.E.2d 188. We therefore reject Cleveland's contention that Hillenmeyer's election of appellate avenues has waived his constitutional claims.

{¶ 26} Cleveland also suggests that Hillenmeyer should have raised some hypothetical nonconstitutional argument regarding the apportionment of income as a condition precedent to his being able to raise his constitutional arguments. But Hillenmeyer did argue that the CCA's regulation conflicts with the city ordinance and that the games-played method is preempted by R.C. Chapter 718. Because there is no basis for concluding that Hillenmeyer has ignored statutory grounds for relief in order to present a constitutional argument, we reject Cleveland's waiver arguments.

*Occasional-entrants rule—former R.C. 718.011(B)*

{¶ 27} Before discussing the method of allocation chosen by Cleveland, we first examine Hillenmeyer's equal-protection argument that he is entitled to an exemption from the tax because other taxpayers to whom he claims he is similarly situated are so entitled. Hillenmeyer asserts that a statutory 12–day grace period should apply to him because he was in Cleveland for only two days during each of the taxable years.

{¶ 28} Former R.C. 718.011, Am.Sub.S.B. No. 287, 148 Ohio Laws, Part V, 11536, 11538, provided:

> [A] municipal corporation shall not tax the compensation paid to a nonresident individual for personal services performed by the individual in the municipal corporation on twelve or fewer days in a calendar year unless one of the following applies:
>
> * * *
>
> (B) The individual is a professional entertainer or professional athlete, the promoter of a professional entertainment or sports event, or an

employee of such a promoter, all as may be reasonably defined by the municipal corporation.[3]

{¶ 29} This provision, sometimes referred to as the occasional-entrants rule, applies to nonresidents who perform some but not all of their work within the taxing municipality. Hillenmeyer asserts that professional entertainers and in particular, athletes, are similarly situated to other occasional entrants and should therefore enjoy the statutory 12–day grace period during which their activities within Cleveland are exempt from local income tax.

*Tax-law distinctions reviewed deferentially on a rational basis*

{¶ 30} The classification of professional entertainers or athletes as distinct from other occasional entrants, which neither involves fundamental rights nor proceeds along suspect lines, cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. *See Heller v. Doe,* 509 U.S. 312, 319–320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Under this standard, tax distinctions need not be drawn perfectly. *See Phillips Chem. Co. v. Dumas School Dist.,* 361 U.S. 376, 385, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960). Moreover, the assessment of taxes is fundamentally a legislative responsibility, with the result that " '[t]his already deferential standard "is especially deferential" in the context of classifications arising out of complex taxation law.' " *Ohio Apt. Assn. v. Levin,* 127 Ohio St.3d 76, 2010-Ohio-4414, 936 N.E.2d 919 at ¶ 35, quoting *Park Corp. v. Brook Park,* 102 Ohio St.3d 166, 2004-Ohio-2237, 807 N.E.2d 913, ¶ 23, quoting *Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

*No equal-protection violation*

{¶ 31} Excluding entertainers and athletes such as Hillenmeyer from the 12–day grace rule does not violate the equal-protection guarantee.

{¶ 32} First, professional athletes are typically highly paid, and their work is easy to find, so that a city could earn significant revenue with comparative ease. Second, the legislature could rationally find that professional athletes and entertainers and their events incur much larger public burdens relating to police protection and traffic and crowd control, among other public services, than do other occasional entrants. We conclude that these two factors, in addition to the reliance interest of municipalities in the continued levy of existing taxes, are

---

3. The Cleveland ordinances do not directly address the occasional-entrants rule, but CCA's regulations incorporate it by excluding income "the taxation of which is prohibited by * * * any act of the Ohio General Assembly." CCA Regulation 6:11.

sufficient to justify the exclusion of a professional athlete such as Hillenmeyer from the 12–day grace period.[4]

{¶ 33} Municipal nonresident-income-tax regulations originally applied predominantly to rock stars, but a new focus on athletes developed once their salaries started to escalate. *See* Ekmekjian, *The Jock Tax: State and Local Income Taxation of Professional Athletes,* 4 Seton Hall J.Sport L. 229, 234 (1994). Cleveland's regulations for taxing athletes were adopted in the early 1990s.

{¶ 34} In 2000, the General Assembly added the 12–day grace period to former R.C. 718.01(F)(8), Sub.H.B. 477, 148 Ohio Laws 5120, 5122, later recodifying the provision at R.C. 718.011. We believe it was reasonable for the General Assembly to have restricted the further expansion of municipal taxation of nonresidents by creating the 12–day grace period without rolling back the taxes already imposed by Ohio municipalities.

{¶ 35} In addition, Ohio cities had already been imposing local taxes on entertainers and athletes when the 12–day grace period was enacted. Protection of reliance interests constitutes a valid basis for legislative line drawing. *Nordlinger v. Hahn,* 505 U.S. at 12–14, 112 S.Ct. 2326, 120 L.Ed.2d 1; *see also United States RR. Retirement Bd. v. Fritz,* 449 U.S. 166, 178, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Imposing a limit on local taxation while protecting the cities' interest in collecting existing taxes constituted an adequate rational basis for the General Assembly's actions.

{¶ 36} The United States Supreme Court has recognized that certain taxpayers such as Hillenmeyer may be caught between conflicting rationales:

> [T]he Constitution grants legislators, not courts, broad authority (within the bounds of rationality) to decide whom they wish to help with their tax laws and how much help those laws ought to provide. "The 'task of classifying persons for * * * benefits * * * inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line,' and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration."

*Fitzgerald v. Racing Assn. of Cent. Iowa,* 539 U.S. 103, 108, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003), quoting *Fritz* at 179, quoting *Mathews v. Diaz,* 426 U.S. 67, 83–84, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

---

4. Because we reject the equal-protection claim, we need not address the remedial question whether the entertainer/athlete exclusion should be severed and the 12–day rule extended to Hillenmeyer or whether unconstitutionality leads to invalidating the 12–day grace period more broadly.

{¶ 37} We hold that the exclusion of Hillenmeyer from the 12–day grace period does not violate the Equal Protection Clause.

*Due-process violation*

{¶ 38} Although we decide that Cleveland has the power to tax nonresident professional athletes without allowing them the benefit of the 12–day grace period, we hold that the games-played method of determining the tax base fails to afford due process when applied to NFL players like Hillenmeyer.

{¶ 39} The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution states that "[no] State [shall] deprive any person of life, liberty, or property, without due process of law." Cleveland's power to tax reaches only that portion of a nonresident's compensation that was earned by work performed in Cleveland. The games-played method reaches income that was performed outside of Cleveland, and thus Cleveland's income tax as applied is extraterritorial.

{¶ 40} In guarding against extraterritorial taxation, "[t]he Due Process Clause places two restrictions on a State's power to tax income generated by the activities of an interstate business." *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 272–273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978). The first is to require " 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' " *Quill Corp. v. North Dakota*, 504 U.S. 298, 306, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), quoting *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–345, 74 S.Ct. 535, 98 L.Ed. 744 (1954). The second restriction is that "the income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing State.' " *Moorman Mfg. Co.* at 272–273, 98 S.Ct. 2340, quoting *Norfolk & W. Ry. Co. v. Missouri State Tax Comm.*, 390 U.S. 317, 325, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968).

{¶ 41} When it first addressed the power of states to impose income taxes, the United States Supreme Court stated that "[g]overnmental jurisdiction in matters of taxation * * * depends upon the power to enforce the mandate of the state by action taken within its borders, either *in personam* or *in rem*." *Shaffer v. Carter*, 252 U.S. 37, 49, 40 S.Ct. 221, 64 L.Ed. 445 (1920). Extending a state or local income tax to all the elements of income realized by city residents rests upon the authority to legislate in personam in relation to those residents and domiciliaries. *See id.* at 52.

{¶ 42} Beyond in personam taxing jurisdiction over residents, local authorities may tax nonresidents only if theirs is the jurisdiction "within which the income actually arises and whose authority over it operates *in rem*." *Id.* at 55, 40 S.Ct. 221. The *Shaffer* court reasoned:

[J]ust as a State may impose general income taxes upon its own citizens and residents whose persons are subject to its control, it may, as a necessary consequence, levy a duty of like character, and not more onerous in its effect, upon incomes accruing to non-residents from their property or business within the State, *or their occupations carried on therein* * * *.

(Emphasis added.) *Id.* at 52.

{¶ 43} Under *Shaffer*'s principle, the income of a nonresident is the "res," or thing, that lies within the taxing jurisdiction by virtue of the activity being performed within that jurisdiction. Thus, local taxation of a nonresident's compensation for services must be based on the location of the taxpayer when the services were performed. *See Thompson v. Cincinnati,* 2 Ohio St.2d 292, 208 N.E.2d 747 (1965), paragraphs one and two of the syllabus.

{¶ 44} Two main approaches have been recognized for dividing up a nonresident's income among taxing jurisdictions. Income derived from the conduct of a unitary *trade or business* may be apportioned by a general formula, while *nonbusiness* income must usually be more specifically allocated to that place where the particular increment of income is earned. *See* Peters & Miller, *Apportionability in State Income Taxation: The Uniform Division of Income for Tax Purposes Act and* Allied–Signal, 60 Tax Lawyer 57 (2006).

{¶ 45} Cleveland relies on cases involving the apportionment of business income. By stark contrast with compensation, income from a trade or business may be apportioned according to a general formula among jurisdictions in which the business has operations. The cases Cleveland relies on involve the particular difficulties of apportioning business income, and to that extent they are inapposite. Compensation invokes a simpler rule: compensation must be allocated to the place where the employee performed the work. Cleveland's case citations do not support the use of the games-played method.

{¶ 46} Due process requires an allocation that reasonably associates the amount of compensation taxed with work the taxpayer performed within the city. The games-played method results in Cleveland allocating approximately 5 percent of Hillenmeyer's income to itself on the basis of two days spent in Cleveland. By using the duty-days method, however, Cleveland is allocated approximately 1.25 percent based on the same two days. By using the games-played method, Cleveland has reached extraterritorially, beyond its power to tax. Cleveland's power to tax reaches only that portion of a nonresident's compensation that was earned by work performed in Cleveland. The games-played method reaches income for work that was performed outside of Cleveland, and thus Cleveland's income tax violates due process as applied to NFL players such as Hillenmeyer.

Hume v. Limbach

{¶ 47} Our decision that Cleveland's application of the games-played method violates the Due Process Clause as it is applied to Hillenmeyer corresponds with an analogous case construing and applying the state income tax. *Hume v. Limbach,* 61 Ohio St.3d at 387, 575 N.E.2d 150. In that case, the taxpayer, Thomas Hume, a pitcher employed by the Cincinnati Reds, petitioned against a state income-tax deficiency assessment issued against him. The Reds employed Hume under a contract requiring him to participate in spring training, preseason exhibition games, regular-season games, and the League Championship and World Series, if necessary, and paying him for these services an annual salary that he received in installments during the regular playing season. As a nonresident of Ohio, Hume claimed a credit on his state-income-tax returns for the number of days he attended spring training and exhibition games played outside Ohio, in addition to regular-season away games. The tax commissioner asserted that Hume could allocate to other states only the income received for the regular-season away games, not the spring training and preseason exhibition games. As in Hillenmeyer's case, the tax commissioner's allocation method led to a significantly higher percentage of Hume's compensation being subjected to Ohio income tax. The BTA affirmed, but we reversed.

{¶ 48} We held that Hume "was compensated for the training season and exhibition games, despite receiving payment only during the playing season." *Id.* at 389. In other words, *all* compensation received for services was to be included as part of a ratio when allocating Ohio and non-Ohio income. Contrary to the BTA's finding in the present case, *Hume* did involve a dispute about how the allocation ratio should be constructed in terms of which activities were counted, just as the present case does.

{¶ 49} Cleveland's games-played method imposes an extraterritorial tax in violation of due process, because it foreseeably imposes Cleveland income tax on compensation earned while Hillenmeyer was working outside Cleveland. Consistent with the rule that the taxing authority may not collect tax on a nonresident's compensation earned outside its jurisdiction, the duty-days method properly includes as taxable income only that compensation earned in Cleveland by accounting for all the work for which an NFL player such as Hillenmeyer is paid, rather than merely the football games he plays each year. This method therefore comports with due process and ensures that the tax collected is not disproportionate to the income received for work in Cleveland.

*Commerce Clause claims not reached*

{¶ 50} A state tax measure conforms to the requirements of the Commerce Clause, U.S. Constitution, Article I, Section 8, cl. 3, if " 'the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does

not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Internatl. Thomson Publishing, Inc. v. Tracy,* 79 Ohio St.3d 415, 418, 683 N.E.2d 1091 (1997), quoting *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). This standard is understood to be a four-prong test. *See Norandex, Inc. v. Limbach,* 69 Ohio St.3d 26, 27, 630 N.E.2d 329 (1994).

{¶ 51} Hillenmeyer raises a claim that the games-played method violates the fair-apportionment prong of the *Complete Auto* test. He also contends in his brief that the games-played method fails under two other portions—the fairly-related and antidiscrimination prongs of the test. But because the notice of appeal to this court specifies only fair-apportionment, we lack jurisdiction to entertain the other two claims. *Norandex, Inc.* at 31, fn. 1.

{¶ 52} Furthermore, Hillenmeyer's Commerce Clause claim under the fair-apportionment prong seeks no relief other than what we have already deemed appropriate pursuant to due process. Because the due-process analysis is dispositive, we decline to address the Commerce Clause challenge.

## CONCLUSION

{¶ 53} We hold that Cleveland's use of the games-played method violates due process as applied to NFL players such as Hillenmeyer. Under the duty-days method, which provides due process and satisfies Cleveland's municipal-income-tax ordinance, Hillenmeyer is entitled to a partial refund of the tax paid. While other computation methods might also provide due process, Cleveland has not suggested any method of alternative relief.

{¶ 54} We therefore reverse the decision of the BTA, and we remand with the instruction that tax refunds be awarded on the basis of Hillenmeyer's duty-days calculation, together with interest as appropriate, in accordance with this opinion.

Judgment reversed
and cause remanded.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

———

Hemenway & Barnes, L.L.P, Stephen W. Kidder, and Ryan P. McManus; and Zaino, Hall & Farrin, L.L.C., and Richard C. Farrin, for appellant.

Barbara A. Langhenry, Cleveland Director of Law, and Linda L. Bickerstaff, Assistant Director of Law, for appellees.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Michael J. Hendershot, Chief Deputy Solicitor, Stephen P. Carney, Deputy Solicitor, and Daniel W. Fausey and David D. Ebersole, Assistant Attorneys General, urging affirmance for amicus curiae state of Ohio.

Zaino, Hall & Farrin, L.L.C., and Thomas M. Zaino, urging reversal for amici curiae National Football League Players Association, Major League Baseball Players Association, National Hockey League Players Association, and National Basketball League Players Association.