[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *T. Ryan Legg Irrevocable Trust v. Testa,* Slip Opinion No. 2016-Ohio-8418.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-8418

T. RYAN LEGG IRREVOCABLE TRUST, APPELLANT AND CROSS-APPELLEE, *v.* TESTA, TAX COMMR., APPELLEE AND CROSS-APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *T. Ryan Legg Irrevocable Trust v. Testa,* Slip Opinion No. 2016-Ohio-8418.]

*Taxation—R.C. 5747.01(BB)—Challenge to this court's jurisdiction rejected—Trustee authorized filing of petition for reassessment and notice of appeal to the Board of Tax Appeals—Trust's capital gains on sale of shares in pass-through entity constituted "qualifying trust amount"—Imposition of tax did not violate trust's due-process or equal-protection rights—Trust has legal basis for seeking reduced Ohio allocation—Decision affirmed in part and reversed in part and cause remanded for determination of proper Ohio allocation.*

(No. 2015-0917—Submitted August 30, 2016—Decided December 28, 2016.)

APPEAL AND CROSS-APPEAL from the Board of Tax Appeals, No. 2013-1469.

_____

**FRENCH, J.**

{¶ 1} Appellant and cross-appellee, the T. Ryan Legg Irrevocable Trust (hereinafter, the "trust"), appeals a decision of the Board of Tax Appeals ("BTA") that affirmed a tax on the trust's 2006 income. The trust argues that the tax on its capital gains from the sale of its stock in an Ohio company is unlawful and unconstitutional. On cross-appeal, the tax commissioner contends that this court lacks jurisdiction because the trustee did not authorize the filing of the trust's appeal before the BTA or its petition for reassessment before the tax commissioner.

{¶ 2} We reject at the outset the jurisdictional arguments raised in the tax commissioner's cross-appeal and affirm the BTA's denial of the commissioner's motion to dismiss. Turning next to the trust's appeal, we conclude that the trust's capital gain constituted a "qualifying trust amount" subject to Ohio income tax on an apportioned basis but that the trust had a legal basis for seeking a reduced Ohio allocation. We also conclude that the tax assessment did not violate the Due Process Clause of the United States Constitution or the Equal Protection Clauses of the United States and Ohio Constitutions. We therefore affirm in part the BTA's decision to uphold the assessment, and we vacate that decision in part and remand to the tax commissioner for a determination of the proper Ohio allocation.

**Facts**

*1. The family trust*

{¶ 3} T. Ryan Legg, an Ohio resident in 2005 and 2006, co-founded Total Quality Logistics, Inc. ("Logistics"), a trucking-logistics business, in 1997. He owned the business with Ken Oaks. Legg and Oaks each held 50 percent of the company's shares, and for tax purposes, the corporation was a pass-through entity. *See* R.C. 5747.01(K) (referring to R.C. 5733.04(O), which defines "pass-through entity" as "a corporation that has made an election under subchapter S of Chapter 1 of Subtitle A of the Internal Revenue Code for its taxable year under that code").

**{¶ 4}** In 2005, Legg withdrew from the business. In November 2005, Legg transferred his half of the Logistics shares into two trusts: 32.5 percent of the Logistics shares went into the T. Ryan Legg Irrevocable Trust, the appellant and taxpayer in this case, and 17.5 percent of the shares went into a different trust. On December 2, 2005, the trusts entered into a purchase agreement by which the shares Legg had granted to the trusts would be sold, in effect, to his former business partner Oaks.[1] Although the trusts and the purchase agreement are dated November 14, 2005, and December 2, 2005, respectively, the sale of the shares did not close until February 2006.

**{¶ 5}** The trust agreement appointed a trustee under Delaware law, stated that it was controlled by Delaware law, and designated Legg and his family members as beneficiaries. During a specified "initial period," the trustee was required to retain the trust's income and add it to the trust assets. That period effectively extended from November 14, 2005, to January 3, 2007.

**{¶ 6}** In February 2006, the trust closed on the purchase and transferred its shares. The sale generated capital gain of $18,614,242.

### 2. Procedural history

**{¶ 7}** On May 26, 2009, the Ohio Department of Taxation issued a notice of assessment for $1,275,597 in unpaid taxes, plus interest and penalties, for a total amount due of $1,868,382. The department referred to the gain as "business income" but then proceeded to apply an apportionment method prescribed by R.C. 5747.212 that is proper for certain types of "modified nonbusiness income." *See* R.C. 5747.01(BB)(4)(c)(ii). Specifically, the department calculated an apportionment ratio for 2004, 2005, and 2006 based on Logistics's Ohio-based property, payroll, and sales; took the average for those three years; and apportioned 91.8307 percent of the trust's 2006 gain to Ohio.

---

[1] The purchase agreement also provides for the sale of Legg's one-half interest in two other entities. But the gain from the sale of shares in Logistics is the only issue before us.

**{¶ 8}** The trust petitioned for reassessment. In his March 2013 final determination, the commissioner found that the trust was a nonresident under R.C. 5747.01(I)(3) and upheld the assessment on two grounds. First, the capital gain was subject to Ohio tax as a "qualifying trust amount" under R.C. 5747.01(BB)(2). Second, as an alternative, the commissioner held that the capital gain was properly apportioned to Ohio under a March 2006 amendment to the statutes that called for "modified nonbusiness income" to be apportioned pursuant to the requirements of R.C. 5747.212. *See* R.C. 5747.01(BB)(4)(c)(ii); 2006 Am.Sub.H.B. No. 530, 151 Ohio Laws, Part III, 5982, and Part IV, 6690-6691. The final determination upheld the assessment of tax and interest, but abated the late-payment penalty. As a result, the total amount assessed was reduced from $1,868,382 to $1,473,192.

**{¶ 9}** The trust appealed to the BTA, which held a hearing in May 2014. Less than 48 hours before the hearing, the tax commissioner filed a motion to dismiss, arguing that the BTA lacked jurisdiction because the trust had not shown that the trustee had authorized the filing of the notice of appeal and the petition for reassessment.

**{¶ 10}** The BTA issued its decision in May 2015. BTA No. 2013-1469, 2015 WL 2169402, *1 (May 5, 2015). The decision denied the tax commissioner's motion to dismiss. The BTA noted that then-trustee Charles Schwab Bank had submitted a notice to the commissioner declaring attorneys Mark Loyd and Kevin Ghassomian, along with their law firm, Greenebaum, Doll & McDonald, as the trust's representatives before the Department of Taxation. *Id.* The declaration was submitted to the commissioner in August 2008, prior to the assessment and petition for reassessment. *Id.* In 2009, UBS Trust became the trustee. *Id.* The BTA found that "the record, as a whole, * * * indicates that UBS, Mr. Legg as grantor/beneficiary of the trust, and counsel themselves, at all times, considered Greenebaum Doll & McDonald (and its successor Bingham Greenebaum Doll LLP) to be the authorized representative of the subject trust." *Id.*

4

**{¶ 11}** On the merits, the BTA upheld the assessment based on several findings. The BTA found that the capital gain constituted a "qualifying trust amount" under the statutes but additionally determined that the gain constituted apportionable "business income." *Id.* at *3-4. The BTA also determined that the trust was taxable as a resident trust. *Id*. at *4.

**{¶ 12}** The trust has appealed, and the tax commissioner has asserted a cross-appeal challenging the denial of his motion to dismiss. We reject the cross-appeal, and we affirm the decision of the BTA.

**The Tax Commissioner Has Not Proved that the Trust's Counsel Lacked Authority to File the Tax Appeals**

**{¶ 13}** Because the cross-appeal presents a threshold question of jurisdiction, we consider it first. We note that the tax commissioner states two reasons why the BTA lacked jurisdiction to review his final determination: counsel did not have the authority to file the notice of appeal on behalf of the trustee and counsel did not have the authority to prosecute the petition for reassessment. We reject both arguments.

*1. The commissioner has neither rebutted attorney Loyd's presumptive authority to file the BTA appeal nor shifted the burden to the trust*

**{¶ 14}** With respect to the notice of appeal to the BTA, we hold that the tax commissioner's cross-appeal must fail because the tax commissioner has not rebutted the presumption that the lawyer representing the trust possessed authority to file the appeal. Mark Loyd was and is an Ohio attorney who, using his Ohio attorney-registration number, signed the notice of appeal and submitted it on behalf of the trust. As a result, a very strong presumption arose that Loyd had the authority to appear on the trust's behalf and prosecute the appeal.

**{¶ 15}** "When an attorney files an appeal, it is presumed he has the requisite authority to do so." *State ex rel. Gibbs v. Zeller*, 2d Dist. Montgomery No. 9170, 1985 WL 7625, *1 (Jan. 24, 1985); *see also FIA Card Servs., N.A. v. Salmon*, 180

Ohio App.3d 548, 2009-Ohio-80, 906 N.E.2d 467, ¶ 13 (3d Dist.) (" 'there is a presumption that a regularly admitted attorney has authority to represent the client for whom he appears' "), quoting *Minnesota v. Karp*, 84 Ohio App. 51, 53, 84 N.E.2d 76 (1st Dist.1948); *accord Hill v. Mendenhall*, 88 U.S. 453, 454, 22 L.Ed. 616 (1874) ("When an attorney of a court of record appears in an action for one of the parties, his authority, in the absence of any proof to the contrary, will be presumed").

**{¶ 16}** This basic presumption applies with enhanced force in this case, given that attorney Loyd was one of two persons originally appointed to represent the trust before the tax department.  His continuous representation extended all the way from that appointment in August 2008, through the filing of the reassessment petition and the appeal to the BTA, to presenting the oral argument in this appeal.

**{¶ 17}** The tax commissioner's burden was to offer "substantial proof in the form of countervailing evidence that authority is lacking, in order to justify, on that ground, an order to strike" the notice of appeal.  (Citations omitted.)  *See Booth v. Fletcher*, 101 F.2d 676, 683 (D.C.Cir.1938).  To shoulder this burden and rebut the presumption, the commissioner offered the affidavit of Assistant Attorney General David Ebersole, who affirmed the affidavit's contents in his live testimony before the BTA.  The affidavit relates that during a telephone conversation with Bailey Roese, one of the trust's lawyers, in response to a suggestion that the current trustee was a party to the BTA case, Roese "identified Thomas Ryan Legg, *not* the trust itself, as 'the client' and the person who authorized her and Mark Loyd to represent the Legg Trust."  (Emphasis sic.)

**{¶ 18}** The tax commissioner characterizes this as an admission that the lawyers lacked authority from the trustee itself, but we reject that contention both because it is an offhand comment embedded in a conversation concerning other matters and because it simply does not constitute a denial that counsel had authority

6

from the trust. We do not regard the affidavit testimony as satisfying the "substantial proof" burden.

{¶ 19} In addition, the record contains evidence of counsel's authority in the form of a letter presented by the trust at the BTA hearing and marked as exhibit 23, along with an affidavit submitted in response to the motion to dismiss. These submissions put the issue to rest. The letter was written in response to the tax commissioner's eleventh-hour motion to dismiss and is signed by trust officers of the then-current trustee, UBS Trust Company. The letter expresses approval of counsel's actions on behalf of the trust and states that UBS "has also formally engaged [Loyd's law firm] to pursue the Tax Controversy, including the Appeal [to the BTA]." The affidavit was created after the BTA hearing and attached to the trust's memorandum opposing the motion to dismiss; it is sworn by a trust officer of UBS and, in essence, reiterates the content of the letter.

{¶ 20} What the tax commissioner is essentially arguing is that no notice of appeal to the BTA could have been filed without (1) a specific act of authorization for that particular filing issued by the trustee to counsel before the filing was effected and (2) proof of that act at the demand of the opposing party, the tax commissioner himself. The tax commissioner further contends that we must infer that there was no such act on the ground that if there had been, the trust would have proved it.

{¶ 21} The tax commissioner cites case law stating that the trustee must authorize action on behalf of the trust. The tax commissioner, however, offers no case law or any other authority supporting the premise that a highly specific act of authorization was necessary, given that counsel had clearly been engaged to handle the tax protest. We see no reason why a trustee cannot engage a lawyer, entrust the tax matter to the lawyer, and keep tabs on the progress of the litigation, without additionally being required to maintain a file of specific authorizations that may

later be produced when a party-opponent chooses to make an issue of the authority possessed by the trust's lawyer.

{¶ 22} We reject the commissioner's theory that merely because the commissioner raised this issue, the trust acquired the burden of making a specific proof of authorization that is satisfactory to the commissioner's counsel. The trust had no burden to do anything more than it in fact did. We hold that the notice of appeal to the BTA was validly filed and that it invoked the BTA's jurisdiction to review the final determination of the tax commissioner.

*2. The petition for reassessment was also validly filed*

{¶ 23} The tax commissioner contends that even if the notice of appeal to the BTA were valid, the BTA would still have lacked jurisdiction because of the alleged invalidity of the reassessment petition. The petition was filed on or about July 20, 2009, identified the trust as taxpayer and the assessment being contested, and was signed by Mark A. Loyd on behalf of himself and Kevin R. Ghassomian.

{¶ 24} To understand the tax commissioner's argument, it is necessary to look at the change of trustees and how that relates to the time that the petition was filed. The trust agreement named U.S. Trust Company of Delaware as trustee and also provided for the replacement of the trustee. Charles Schwab Bank succeeded U.S. Trust as trustee in January 2008. UBS Trust Company, N.A., succeeded Charles Schwab Bank as trustee on June 5, 2009, and UBS remained trustee at all relevant times thereafter.

{¶ 25} The tax commissioner argues that because the trustee changed on June 5, 2009, and because the "address" on the July 20, 2009 petition for reassessment identified the address of the former trustee, Charles Schwab Bank, rather than the current trustee, UBS Trust Company, the petition does not reflect proper authorization by the new trustee. To this circumstance, the tax commissioner adds the inference that he draws from the telephone conversation attested to in Ebersole's affidavit.

8

**{¶ 26}** We conclude that the petition was validly filed based on the record before us. In response to the initiation of the audit that led to the assessment and subsequent petition, the trust filed two "TBOR-1" forms correctly identifying the trust as taxpayer and Charles Schwab Bank as the then-current trustee. A "Senior Trust Officer" of that bank signed the forms, which appointed "Mark Loyd, Greenbaum Doll & McDonald PLLC" and "Kevin R. Ghassomian, Greenbaum Doll & McDonald PLLC" to "represent the taxpayer before the Department of Taxation," which expressly included the power to "file petitions or applications." The forms recite that they remain valid until one year after the date signed, that is, one year from August 28, 2008.

**{¶ 27}** Thus, both Loyd and Ghassomian of the Greenebaum law firm had been duly appointed to represent the trust on forms prescribed by the tax department for that very purpose. The tax commissioner does not contest the validity of these forms, and there is no dispute that Charles Schwab Bank was the trustee at the time the forms were executed. On their face, the forms were valid for one year, and the reassessment petition was filed within that year.

**{¶ 28}** Quite simply, Loyd and Ghassomian had uncontested authority to represent the trust conferred by the TBOR-1 forms and to file the petition for reassessment, and the erroneous address on the petition does not change that fact. The tax commissioner has pointed to no requirement in statute or rule that the current trustee's address be accurately reported on the petition, and it is significant that the statutes impose the tax on the trust itself, which therefore is the taxpayer, the assessed party, and the petitioner in the proceedings before the tax department. R.C. 5747.02(A) ("there is hereby levied [an income tax] on every * * * trust ** * residing in or earning or receiving income in this state * * *"). Loyd and Ghassomian were the duly appointed tax representatives of the trust under tax-department procedures, and they acted timely within the scope of that appointment when they filed the reassessment petition in July 2009.

{¶ 29} We hold that these circumstances establish that the petition for reassessment was validly filed and that the absence of a specific act of authorization for the filing of the petition from the new trustee did not impair the ability of the trust's appointed tax representatives to act on behalf of the trust in contesting the tax assessment.

{¶ 30} Because we conclude that the tax commissioner's cross-appeal has no merit, we proceed to consider the issues raised by the trust on appeal.

**The Capital Gain at Issue Constitutes a "Qualifying Trust Amount" that Can Properly Be Allocated in Part to Ohio**

{¶ 31} In his final determination, the tax commissioner found that the gain at issue constitutes a "qualifying trust amount" that could be apportioned to Ohio. The BTA affirmed that finding, and on appeal the trust contests that basis for the assessment by arguing that relevant records were not "available," as the statute requires.

*1. The gain constituted a "qualifying trust amount"*

{¶ 32} R.C. 5747.01(BB)(2)'s definition of "qualifying trust amount" includes capital gains realized "from the sale, exchange, or other disposition of equity or ownership interests in, or debt obligations of, a qualifying investee to the extent included in the trust's Ohio taxable income," but only if two conditions are satisfied. First, under R.C. 5747.01(BB)(2)(a), the "book value of the qualifying investee's physical assets in this state and everywhere, as of the last day of the qualifying investee's fiscal or calendar year ending immediately prior to the date on which the trust recognizes the gain or loss" must be "available to the trust." Second, under R.C. 5747.01(BB)(2)(b), the requirements of R.C. 5747.011 must be satisfied—most notably, the requirement that the trust's ownership interest be at least 5 percent of the total outstanding ownership interests "at any time during the ten-year period ending on the last day of the trust's taxable year in which the sale, exchange, or other disposition occurs," *see* R.C. 5747.011(B).

{¶ 33} The trust does not dispute that Logistics constitutes a "qualifying investee" under R.C. 5747.01(BB)(5)(a), nor that the 5-percent-ownership criterion in R.C. 5747.011(B) is also satisfied. The only issue the trust raises on appeal with respect to the satisfaction of the requirements for deeming its capital gain a "qualifying trust amount" concerns the "availability" of the records of Logistics. Under R.C. 5747.01(BB)(6), "available" means that the "information is such that a person is able to learn of the information by the due date plus extensions, if any, for filing the return for the taxable year in which the trust recognizes the gain or loss."

{¶ 34} The BTA found that "the record establishes that the book value of the [Logistics] assets was available to the trust, whether it was actually requested or not, as it was utilized by the trust's tax preparer." BTA No. 2013-1469, 2015 WL 2169402, at *3. The trust contends that although the information at issue may have been available to its accountant, who was also Logistics's accountant, that does not mean that the information was available to the trust itself. That is, the accountant had separate duties to each of his clients, and those duties precluded him from making Logistics information available to the trust.

{¶ 35} Under the circumstances, and given the language of the "qualifying trust amount" provision, we find unpersuasive the trust's argument that the book value of Logistics's physical assets was unavailable to it. First, R.C. 5747.01(BB)(2)(a) establishes that the relevant information is the location of the physical assets of Logistics "as of the last day of [Logistics's] fiscal or calendar year ending immediately prior to the date on which the trust recognizes the gain." Since the purchase agreement for the Logistics shares closed in February 2006, the date for determining the physical-assets allocation preceded the closing; indeed, it would probably fall at the end of calendar year 2005. Because the allocation date falls before the shares were transferred, the trust would have been able to exercise its shareholder's right to access Logistics's corporate financial information pursuant to R.C. 1701.37(C). That section provides that "[a]ny shareholder" may

make a "written demand stating the specific purpose thereof" and thereby examine "for any reasonable and proper purpose" various corporate documents, including "books and records of account."

{¶ 36} The trust clearly would have had a "proper purpose" in accessing such information. On the one hand, the trust was a pass-through taxpayer with respect to its share of Logistics's corporate earnings during 2005. It is difficult to conceive of any valid objection a closely-held corporation could raise to a shareholder's examining information that directly bears on the shareholder's own pass-through income-tax liability. And the fact that passed-through business income of the corporation is ordinarily apportioned, in part, by a property factor that would encompass physical assets of the corporation, *see* R.C. 5747.21(B), citing R.C. 5733.05(B)(2), means that the shareholder as taxpayer to some degree accesses such information in preparing its returns in the ordinary course.

{¶ 37} The purchase agreement itself underscores this point by directly addressing the issue of income-tax liability for calendar year 2005. At section 9, the purchase agreement provides that the buyer and seller will split the 2005 tax expense equally and, in relation to that liability, each will receive a distribution from Logistics amounting to its 50 percent share of a specified portion (42.5 percent) of the cash-basis taxable income of the corporation. And under the agreement, the buyer is to deliver that distribution in connection with the closing.

{¶ 38} We are persuaded that in enacting the qualifying-trust-amount provision, the legislature thought that the provision would ordinarily apply to a trust that is a pass-through shareholder of a closely-held corporation, precisely because such a trust, as that type of shareholder, would usually have access to the relevant corporate information in the course of complying with its own tax obligations.

{¶ 39} Finally, the statute does not on its face preclude a taxpayer from asserting that it failed to obtain or retain information that was once available to it

and that when it later requested the information, it was refused. Notably, the trust makes no such claim here.

{¶ 40} Nevertheless, the trust argues that the purchase agreement prevented it from accessing the relevant information. The only provision of that agreement relevant to this point is Section 2, which grants the trust as seller the right to access Logistics's books upon the occurrence of a "monetization event"—i.e., one of the events enumerated in the agreement that might require a price adjustment. Because the evidence showed that no monetization event occurred, the trust concludes that the purchase agreement permitted no right of access. We disagree.

{¶ 41} Section 2.5 of the purchase agreement states that the buyer "shall provide to Seller the right and opportunity for Seller and Seller's advisors to review * * * the books and records of [Logistics] to the extent necessary to determine whether a Monetization Event has occurred and the consideration to which Seller is entitled as a result of the Monetization Event." Under Section 2, a monetization event is an event that occurs *after closing* that may entitle the seller to receive additional compensation for the sale of its shares. Nothing in that provision purports to address the right of the trust to access *pre-closing* information that relates to its tax liabilities. And as discussed, it is that information that would include the information relevant to the physical-assets allocation of the gain as a "qualifying trust amount." We reject the trust's invitation to read an implied prohibition of access into Section 2, which relates to matters that occur after closing.

{¶ 42} The trust also cites *Alcan Aluminum Corp. v. Limbach*, 42 Ohio St.3d 121, 537 N.E.2d 1302 (1989), but we conclude that the case does not support the trust's position in this appeal. In that case, we construed the term "available" in a different but analogous statute and held that physical-asset-location information could properly be found to be "available" to a taxpayer that was a 50 percent shareholder of the subsidiary corporation. The trust argues that because it owned

only 35 percent of Logistics and was not itself engaged in the business of Logistics, it did not have the same right of access to Logistics's asset information. But we do not think that *Alcan Aluminum* militates against finding that Logistics's physical-asset information was available here. Although the trust owns a smaller percentage of corporate shares and is not itself engaged in the corporate business, it nonetheless qualifies as a pass-through shareholder for Logistics, bears the income-tax consequences of the operation of the business, and enjoys the statutory right to access corporate information. For the reasons already discussed, this circumstance supports the BTA's finding that the physical-asset information was "available" to the trust.

**{¶ 43}** We conclude that the allocation information was "available" to the trust and that the gain at issue therefore constituted a "qualifying trust amount."

2. *Because the income is a "qualifying trust amount," it is neither "modified business income" nor "modified nonbusiness income"*

**{¶ 44}** The trust next argues that the capital gain at issue should be allocated outside Ohio as "modified nonbusiness income," not "modified business income." However, because we have affirmed the finding that the income is a "qualifying trust amount," the distinction between business and nonbusiness income is moot.

**{¶ 45}** Ohio taxes trusts on their "modified Ohio taxable income." R.C. 5747.02(A)(1). The modified Ohio taxable income is the sum of the trust's Ohio-apportioned or -allocated share of "modified business income," "qualifying investment income," and the "qualifying trust amount," along with the entire amount of a resident trust's "modified nonbusiness income." R.C. 5747.01(BB)(4)(a) to (c). R.C. 5747.01(BB)(1) in turn defines "modified business income" as "the business income included in a trust's Ohio taxable income after such taxable income is first reduced by the qualifying trust amount, if any." The statute therefore specifically excludes the qualifying trust amount from treatment as modified business income. Additionally, R.C. 5747.01(BB)(3) defines

14

"modified nonbusiness income" as income "other than modified business income" and "other than the qualifying trust amount." It follows that the underlying distinction between business income and nonbusiness income is not relevant once the income in question has been determined to be a "qualifying trust amount," because, as such, that income is expressly excluded from the other categories of income for purposes of trust income taxation. We hold that because the trust's income is a "qualifying trust amount," it was neither "modified business income" nor "modified nonbusiness income."

**{¶ 46}** We therefore hold that the BTA erred by considering whether the gain at issue was business or nonbusiness income. After upholding the commissioner's finding that the gain was a "qualifying trust amount," the BTA proceeded to consider the status of the income in relation to the distinction between business income and nonbusiness income under R.C. 5747.01(B) and (C). That was error because once the BTA affirmed the tax commissioner's determination that the gain was a "qualifying trust amount," that fact alone precluded the gain from being treated as "modified business income" or as "modified nonbusiness income" under R.C. 5747.01(BB).

**{¶ 47}** Under these circumstances, we vacate the BTA's finding that the gain at issue constituted "business income" under R.C. 5747.01(B).

*3. Because the state used the wrong method of allocating the gain to Ohio, the cause will be remanded*

**{¶ 48}** The trust argues that to the extent that the income is a qualifying trust amount, the "income cannot be attributable 100% to Ohio." That assertion embodies an error concerning the allocation method used by the tax commissioner; he did not allocate the gain from the sale of Logistics shares 100 percent to Ohio. Instead, the commissioner averaged the business-income apportionment factors for three years and, based on that average, apportioned 91.8307 percent to Ohio.

**{¶ 49}** Despite the factual error within the trust's assertion, however, we agree that the trust has a legal basis for seeking a reduced Ohio allocation. Because the income constitutes a "qualifying trust amount," R.C. 5747.01(BB) prescribes not an apportionment based on the average of three years of Logistics's business-income factor, but rather an allocation based on the Ohio share of Logistics's physical assets as of the "last day of [Logistics's] fiscal or calendar year ending immediately prior to the date on which the trust recognizes the qualifying trust amount." R.C. 5747.01(BB)(4)(b).

**{¶ 50}** Moreover, contrary to the tax commissioner's argument, the statute does not authorize an alternative allocation method for the "qualifying trust amount." The commissioner relies on a passage contained in R.C. 5747.01(BB)(4), which reads as follows:

> If the allocation and apportionment of a trust's income *under divisions (BB)(4)(a) and (c) of this section* do not fairly represent the modified Ohio taxable income of the trust in this state, the alternative methods described in division (C) of section 5747.21 of the Revised Code may be applied in the manner and to the same extent provided in that section.

(Emphasis added.) R.C. 5747.01(BB)(4)(c)(ii). The quoted passage explicitly authorizes alternatives for allocating *all the other types of trust income* (divisions (4)(a) and (4)(c)), and by doing so clearly implies the *absence of such authority for division (4)(b)*, which is the provision addressing the taxation of a "qualifying trust amount."

**{¶ 51}** The foregoing discussion shows that the trust would be entitled to a reduced Ohio allocation if the physical-asset allocation were less than 91.8307 percent. Indeed, the record indicates the possibility of a physical-assets ratio less

than that percentage. Namely, the property factor for tax year 2005, which would presumably include physical assets as of the end of the antecedent tax year, was 80.5094 percent.

{¶ 52} The tax commissioner argues that we lack jurisdiction to review and remand this issue because the trust's only argument before the BTA on this point was that its income should be allocated 100 percent outside Ohio. The tax commissioner couches the argument as a waiver of any other alternative apportionment ratio. However, the trust's notice of appeal to the BTA asserted that "even under [the tax commissioner's] own position," i.e., that the gain was a qualifying trust amount, the commissioner's apportionment under R.C. 5747.01(BB)(4)(b) was "erroneously overstated" and that the trust was seeking a reduced apportionment as a "fraction" that was "something less than 100%" based on the book value of Logistics's physical assets in Ohio. The trust's notice of appeal therefore stated the error with sufficient specificity to invoke the BTA's and this court's jurisdiction. *See MCI Telecommunications Corp. v. Limbach*, 68 Ohio St.3d 195, 197, 625, N.E.2d 597 (1994) (declining to deny review based on a "hypertechnical reading" of the notice of appeal), citing *Buckeye Internatl., Inc. v. Limbach*, 64 Ohio St.3d 264, 268, 595 N.E.2d 347 (1992).

{¶ 53} Under these circumstances, we must remand to the tax commissioner for a determination of the proper allocation to Ohio based on the applicable legal standard, as clarified above.

### The Assessment Violates Neither Due Process nor Equal Protection

{¶ 54} To the extent that the statutes permit the assessment, the trust argues that the assessment is unconstitutional as violating its rights to both due process and equal protection. As for due process, the trust argues that the income and the taxpayer lack sufficient connection with Ohio to permit the imposition of the tax. As for equal protection, the trust points to the different treatment accorded to a

nonresident trust based on whether it owns S-corporation shares or C-corporation shares.

**{¶ 55}** Before considering the constitutional points, however, we address the BTA's finding that the subject trust should be taxed as a resident trust. This issue has bearing on the trust's and its income's contacts with Ohio for due-process purposes. Additionally, the tax commissioner's contrary finding that the trust is a nonresident is the predicate for the equal-protection issue raised by the trust.

1. *The BTA's finding of trust residency contravenes the tax commissioner's determination, is facially defective, and must therefore be vacated*

**{¶ 56}** The tax commissioner's final determination stated that the trust was a nonresident trust pursuant to R.C. 5747.01(I)(3). The commissioner specifically proceeded on that premise when considering, as an alternative to his finding that the income was a "qualifying trust amount," the proper treatment of the income as "modified nonbusiness income." Thus, the tax commissioner relied on a finding favorable to the trust: that the trust was a nonresident. For obvious reasons, the trust did not contest this finding, nor did the tax commissioner change his position before the BTA.

**{¶ 57}** Yet the BTA made a contrary finding in its decision. BTA No. 2013-1469, 2015 WL 2169402, at *4. Under R.C. 5747.01(I)(3)(a), the residency of a trust depends on whether the assets were transferred into the trust by an Ohio domiciliary/resident and whether a "qualifying beneficiary" is an Ohio resident. The BTA found that Legg was an Ohio resident at the relevant times and that he was also a beneficiary of the trust in 2006; that sufficed, according to the BTA, to support the conclusion that the trust was a resident trust.

**{¶ 58}** But the trust has pointed out that the BTA's analysis skips one crucial element necessary for a finding of resident status. The BTA ignored the requirement that the resident beneficiary be a *qualifying* beneficiary, meaning that

18

the beneficiary had to be a "potential current beneficiary" under Internal Revenue Code 1361(e)(2), R.C. 5747.01(I)(3)(c). We agree with the trust on that point.

{¶ 59} The federal provision states:

> For purposes of this section, the term "potential current beneficiary" means, with respect to any period, any person who at any time during such period is entitled to, or at the discretion of any person may receive, a distribution from the principal or income of the trust (determined without regard to any power of appointment to the extent such power remains unexercised at the end of such period). If a trust disposes of all of the stock which it holds in an S corporation, then, with respect to such corporation, the term "potential current beneficiary" does not include any person who first met the requirements of the preceding sentence during the 1-year period ending on the date of such disposition.

26 U.S.C. 361(e)(2).

{¶ 60} The BTA correctly found that Legg was an Ohio resident when he transferred the Logistics shares to the trust, and he was an Ohio resident and a beneficiary during 2006. But the BTA failed to consider the additional requirement that some person qualify as a "potential current beneficiary." This would require the trust terms to have permitted a distribution to a beneficiary during 2006, which under the trust terms was part of the "initial period." At the BTA and again before this court, the trust points to section 2.1(a)(1) of the trust agreement, which required the trustee to accumulate income during the initial period, that is, during all of 2006. The tax commissioner's brief argued in support of the BTA's residency finding without responding to the trust on this point.

{¶ 61} At oral argument before us, the tax commissioner's counsel pointed to two trust provisions that purportedly permitted distributions during 2006: section 3.1(n), which confers upon the trustee the power to "make any distribution or division of trust property in cash or in kind or both, at any time and from time to time," and section 2.1(c)(ii), which speaks of "mak[ing] all principal distributions" to the grantor or other beneficiaries, with the timing of these discretionary acts being "before the initial funding of the Family Trust or thereafter at any time prior to the termination of the Family Trust." We decline to accept, however, the tax commissioner's belated arguments on this point, submitted for the first time at oral argument and never properly briefed or considered below.

{¶ 62} Moreover, we confront a BTA finding contrary to the tax commissioner's final determination that the trust was a nonresident. Absent a finding that the tax commissioner's conclusion was "clearly unreasonable or unlawful," the findings in the final determination are "presumptively valid." *See Hatchadorian v. Lindley*, 21 Ohio St.3d 66, 488 N.E.2d 145 (1986), paragraph one of the syllabus. *See also Alcan Aluminum*, 42 Ohio St.3d at 123, 537 N.E.2d 1302 ("it is error for the BTA to reverse the commissioner's determination when no competent and probative evidence is presented to show that the commissioner's determination is factually incorrect").

{¶ 63} We therefore conclude that the trust should be taxed as a nonresident trust and that the tax commissioner's original determination of the trust's residency was presumptively valid. Accordingly, we must vacate the BTA's residency finding, with the result that the tax commissioner's finding that the trust is a nonresident is reinstated as the basis on which we decide this appeal.

*2. The assessment does not violate the trust's due-process rights*

{¶ 64} The Due Process Clause of the Fourteenth Amendment guards against a state's exceeding its jurisdiction to tax by establishing a twofold test. First, there must be a definite link or a minimum connection between the state and

the person, property or transaction that Ohio seeks to tax; second, the income attributed to the state for tax purposes must rationally relate to values connected with the taxing state. *Hillenmeyer v. Cleveland Bd. of Rev.*, 144 Ohio St.3d 165, 2015-Ohio-1623, 41 N.E.3d 1164, ¶ 40, citing *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 272-273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978), and *Quill Corp. v. North Dakota*, 504 U.S. 298, 306, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).

**{¶ 65}** In *Corrigan v. Testa*, ___ Ohio St.3d ___, 2016-Ohio-2805, ___ N.E.3d ___, we held that the tax imposed by R.C. 5747.212 could not be sustained as applied to Corrigan for two reasons:  first, because the link between Ohio and the capital gain of a nonresident who did not engage in the underlying business was attenuated and second, because there was no showing that attributing the gain to Ohio as if it were business income actually related to the values giving rise to the gain. *See Corrigan* at ¶ 36, 48, 68-69.

**{¶ 66}** We decided *Corrigan* after the briefing in this case, but the trust's counsel relied on it at oral argument.  To be sure, there are two strong parallels between this case and *Corrigan*.  The tax commissioner found that the trust was a nonresident here, just as Corrigan was a nonresident individual.  And the tax commissioner here apportioned to Ohio the capital gain from the sale of the pass-through entity as if it were business income and did so in the very manner prescribed by R.C. 5747.212, the statute that the tax commissioner applied to Corrigan's capital gains from the sale of his ownership interest in Mansfield Plumbing, L.L.C., a pass-through entity.

**{¶ 67}** A more comprehensive look at the situation, however, persuades us that the differences are more important than the similarities.  Although the trust was a nonresident under the statute, it is undisputed that the grantor of the trust and contributor of the Logistics shares, T. Ryan Legg, was an Ohio resident in 2005 and for at least part of 2006.  Moreover, unlike Corrigan, Legg was a founder and manager of the business of the pass-through entity—a material distinction, *see*

*Corrigan* at ¶ 68 (finding the tax unconstitutional as applied to Corrigan "in light of the absence of any assertion or finding that Corrigan's own activities amounted to a unitary business with that of Mansfield Plumbing").

{¶ 68} Properly analyzed, this case involves an Ohio resident who conducted business in significant part in Ohio through the corporate form and who disposed of his business and corporate interest not by a personal sale but by means of a trust that he created to accomplish his objectives for himself and his family. Although Legg deliberately set up a Delaware trust, his Ohio contacts are still material for constitutional purposes.

{¶ 69} In the context of upholding the imposition of inheritance taxes, the United States Supreme Court made a statement that is equally applicable to Legg and his trust in this case. Namely, Legg's own "power to dispose of the intangibles was a potential source of wealth which was property in [his] hands from which [he] was under the highest obligation, in common with [his] fellow citizens of [Ohio], to contribute to the support of the government whose protection [he] enjoyed." *Curry v. McCanless*, 307 U.S. 357, 370-371, 59 S.Ct. 900, 83 L.Ed. 1339 (1939). Just as the inheritance taxes in *Curry* were not imposed on the deceased state resident herself, so too is the trust income tax not directly imposed on Legg—yet his own contacts with Ohio and with the business easily justify the imposition of the tax on the trust from the standpoint of due process. We hold that the tax assessment at issue did not violate the trust's due-process rights.

3. *The assessment does not violate the trust's equal-protection rights*

{¶ 70} The trust argues that the taxation of its "qualifying trust amount" violates its equal-protection rights because no tax is imposed on a nonresident trust when the shares at issue are C-corporation shares rather than pass-through-entity shares. *See* R.C. 5747.01(BB)(5)(b). Under the trust's equal-protection theory, "nonresident trusts" as defined by the statute are "similarly situated" and must therefore be treated the same under the Equal Protection Clause with respect to their

gain from selling corporate shares. Specifically, the trust argues that state tax law must ignore the distinction between taxpaying C corporations and pass-through entities.

{¶ 71} A tax-law classification that "neither involves fundamental rights nor proceeds along suspect lines" will not "run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Hillenmeyer*, 144 Ohio St.3d 165, 2015-Ohio-1623, 41 N.E.3d 1164, at ¶ 30. And because the assessment of taxes is fundamentally a legislative responsibility, the constitutional standard is especially deferential in the context of tax-law classifications. *Id.*

{¶ 72} The trust's burden as the constitutional claimant is heavy. "Under the rational-basis standard, a state has no obligation to produce evidence to sustain the rationality of a statutory classification. * * * Rather, a taxpayer challenging the constitutionality of a taxation statute bears the burden of negating every conceivable basis that might support the legislation." *Ohio Apt. Assn. v. Levin*, 127 Ohio St.3d 76, 2010-Ohio-4414, 936 N.E.2d 919, ¶ 34. And we have endorsed the pronouncement of the United States Supreme Court that " ' "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality" ' " among taxpayers. *Huntington Natl. Bank v. Limbach*, 71 Ohio St.3d 261, 262, 643 N.E.2d 523 (1994), quoting *Nordinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1, quoting *McGowan v. Maryland*, 366 U.S. 420, 425-426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

{¶ 73} We hold that the trust falls well short of proving a constitutional violation in this context. "The comparison of only similarly situated entities is integral to an equal protection analysis." *GTE N., Inc. v. Zaino*, 96 Ohio St.3d 9, 2002-Ohio-2984, 770 N.E.2d 65, ¶ 22, citing *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940). Equal protection "does not require things

which are different in fact * * * to be treated in law as though they were the same." *Tigner* at 147. Corporations that are themselves taxpayers are differently situated with respect to state tax law than are pass-through corporations, and, by extension, shareholders who have elected to carry the corporation's income on their own tax returns are differently situated from those who have not. Moreover, pass-through corporations are more likely to be closely-held corporations in which the shareholder is directly involved in the business, and the fact that this is not universally the case does not defeat the rationality of the distinction overall, *see Vance v. Bradley*, 440 U.S. 93, 108, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required' "), quoting *Phillips Chem. Co. v. Dumas Indep. School Dist.*, 361 U.S. 376, 385, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960).

{¶ 74} Contrary to the trust's argument, this court's decision in *Boothe Fin. Corp. v. Lindley*, 6 Ohio St.3d 247, 452 N.E.2d 1295 (1983), does not require a different result. In *Boothe*, the taxpayer owned computer equipment that it leased to customers. The equipment was manufactured by IBM, which also leased the same type of property to other customers. Boothe reported its leased-out computers on its personal-property-tax return, as did IBM. The computers were taxed at 70 percent of "true value." As a manufacturer, IBM was permitted to determine the true value of its leased-out equipment by calculating its manufacturing cost less depreciation, whereas Boothe was required to use its acquisition cost less depreciation, which led to a true value that was six times that of IBM's true value for the same type of equipment. Boothe challenged the disparity, and this court held that it violated the guarantee of equal protection to Boothe. *Id*. at paragraph two of the syllabus.

**{¶ 75}** We characterized IBM's leased-out equipment as being "grossly undervalued," and we held that "a taxpayer who leases equipment is denied equal protection when a competitor, who manufactures and leases essentially identical equipment, is allowed to grossly undervalue its property." *Id.* at 249-250. *Boothe* differs from the present case, however, because *Boothe* involved differential tax treatment of two business competitors with respect to the valuation of equipment directly used in their competing operations. By contrast, the distinction complained of here treats taxpayers differently by virtue of the tax pass-through status of the corporate entities in which they have invested. For reasons already stated, this differential treatment is rational.

**{¶ 76}** We hold that the assessment at issue here does not violate the trust's equal-protection rights.

### Conclusion

**{¶ 77}** For the foregoing reasons, we vacate the BTA's rulings that the gain at issue constituted business income and that the trust was a resident trust under the statutes. We affirm the BTA's finding that the gain constituted a "qualifying trust amount" under the statute, and we vacate and remand to the tax commissioner for a determination of the proper Ohio allocation in accordance with this opinion.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, KENNEDY, and O'NEILL, JJ., concur.

LANZINGER, J., concurs, with an opinion.

_____

**LANZINGER, J., concurring.**

**{¶ 78}** I concur in the majority's opinion but write separately to express concerns over its analysis of due process and reliance on our recent decision in *Corrigan v. Testa*, ___ Ohio St.3d ___, 2016-Ohio-2805, ___ N.E.3d ___. Based upon my reconsideration of that case in light of this one, and upon further reflection,

I would overrule *Corrigan.* I would also presume the constitutionality of the tax assessed against the Legg Trust and hold that the presumption has not been rebutted.

{¶ 79} The trust asserts that imposing a tax on its capital gains violates its due-process rights. Before *Corrigan*, our analysis would have had a clear starting point: the presumption that the state tax laws and the tax commissioner's application of them was constitutional. *See State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20 ("legislative enactments are entitled to a strong presumption of constitutionality"). But after *Corrigan*, the state has the burden to justify imposing the tax and the court must analyze each new case for fine points of distinction from *Corrigan*. In my view, this change is not merely the ordinary result of applying a recently decided case, it is a distortion of an integral tenet of proper constitutional review—that laws are presumed to be constitutional.

*Summary of* Corrigan

{¶ 80} Briefly stated, *Corrigan* involved a nonresident individual who sold his ownership interest in a limited-liability company that did part of its business in Ohio. Under the version of R.C. 5747.212 that applied to the tax year at issue, the state assessed income tax on a portion of the gain from the sale based on the proportion of business activity that the limited-liability company had conducted in this state over three years. We held that the tax imposed under R.C. 5747.212 could not be sustained for two reasons: first, because of the attenuated link between Ohio and the capital gain of a nonresident who did not engage in the underlying business and second, because there was no showing that attributing the gain to Ohio as if it were business income actually related to the values giving rise to the gain. *Corrigan* at ¶ 36, 48, 68-69.

{¶ 81} In this case, the shareholder that earned capital gains is a trust rather than an individual, and the majority distinguishes *Corrigan* on the grounds that

Legg, the grantor of the trust, was an Ohio resident and participated in the business before the trust sold its shares. I do not disagree with this analysis, but I believe that it ought to be unnecessary. Our holding in *Corrigan* was not based on any showing made by the taxpayer but rather on our conclusion that the state had not controverted our constitutional concerns about the tax.

{¶ 82} After considering the facts of the instant case, I believe that residency of the trust or the grantor or original involvement with the corporate business should be irrelevant. It ought to be enough that the business assets are connected to Ohio in order to tax part of the gain unless the taxpayer shows particular circumstances that make the exercise of state jurisdiction unreasonable.

{¶ 83} Here, I am persuaded that it is the trust's status as investor in Ohio assets or an Ohio business that justifies the tax. Because *Corrigan* controverts that view, I am convinced that we should overrule that decision.

*The* Galatis *standard*

{¶ 84} Stare decisis does not prevent us from revisiting *Corrigan* in this appeal. Because judge-announced constitutional doctrine is, unlike statutory construction, "beyond the power of the legislature to * * * 'correct,' " it is "incumbent on the court to make the necessary changes and yield to the force of better reasoning." *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 6, 539 N.E.2d 103 (1989).

{¶ 85} I am not dissuaded by our stringent test for overruling precedent that is set forth in *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus. First, after *Galatis*, we have "recognize[d] a considerable degree of merit" in the argument that "stare decisis should be applied with greater flexibility in cases of constitutional adjudication." *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 90-91.

**{¶ 86}** Second, in any event, the present situation satisfies the *Galatis* test in that (1) *Corrigan* was wrongly decided at the time, (2) *Corrigan* defies practical workability, and (3) abandoning *Corrigan* would not create an undue hardship for those who have relied on it.

Corrigan—<em>wrongly decided</em>

**{¶ 87}** *Corrigan* was wrongly decided because we erroneously focused on whether Corrigan was engaged in the business that the pass-through entity had conducted in Ohio. Instead, we should have focused, as we do here, on the fact that gain from selling an investment in in-state assets and activities can usually be taxed in proper proportion—whether or not the person realizing the gain is a resident or engages in the business.

**{¶ 88}** No one would dispute, for example, that a nonresident owing an asset located in Ohio—say, real estate in Cleveland—can be taxed on the gain derived from selling that asset. And the mere fact that Ohio assets are owned or activities are conducted through a corporate entity does not bar imposition of the tax. If a nonresident investor is the sole member of a limited-liability company that owns—as its sole asset—the real estate in Cleveland, it makes no difference whether that investor causes the company to sell the real estate, or whether the investor sells the company itself: either way, Ohio may tax the gain because the gain relates to property located in Ohio. We acknowledged this point in *Corrigan*, when we distinguished a decision of the Louisiana Supreme Court. In that case, the tax was justified because it prevented "avoidance of the Louisiana tax on a capital gain from the sale of a Louisiana asset through a manipulation of corporate forms." *Corrigan*, ___ Ohio St.3d ___, 2016-Ohio-2805, ___ N.E.3d ___, at ¶ 58.

**{¶ 89}** The proper next step in the *Corrigan* analysis would have been to conclude that because the nonresident, Corrigan, was an almost 80 percent owner of a limited-liability company that conducted a portion of its business in Ohio, Ohio

could properly tax that portion of the gain that related either to the Ohio business or to its assets in Ohio.

**{¶ 90}** But we did not do this. First, we speculated that the gain might not actually relate to the Ohio business, given that the business had suffered losses in the preceding years; the possibility seemed strong that the gain might actually relate to some specific non-Ohio assets. *Corrigan* at ¶ 48. Second, we read U.S. Supreme Court precedent as distinguishing between state taxes imposed on those who *directly conducted* the in-state business activity and taxes imposed on those who *merely invested* in the business. *Corrigan* at ¶ 50-51, 69. In both respects we erred.

**{¶ 91}** The main error on both points was in failing to presume the constitutionality of Ohio's tax statutes and the validity of the tax commissioner's application of them, to the extent that any rebuttal of their constitutionality must meet an enhanced evidentiary standard. *See Cleveland Gear Co. v. Limbach*, 35 Ohio St.3d 229, 231, 520 N.E.2d 188 (1988) (when tax legislation "is challenged on the ground that it is unconstitutional when applied to a particular state of facts, the burden is upon the party making the attack to present clear and convincing evidence of a presently existing state of facts which makes the Act unconstitutional and void when applied thereto"). More precisely, we should have required Corrigan, the taxpayer in the earlier case, to prove that under the apportionment prescribed by R.C. 5747.212, the income attributed to Ohio for tax purposes was not " 'rationally related to "values connected with the taxing state." ' " *Hillenmeyer v. Cleveland Bd. of Rev.*, 144 Ohio St.3d 165, 2015-Ohio-1623, 41 N.E.3d 1164, ¶ 40, quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 272-273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978), quoting *Norfolk & W. Ry. Co. v. Missouri State Tax Comm.*, 390 U.S. 317, 325, 88 S.Ct. 995, 19 L.Ed. 2d 1201 (1968). Without that showing, which Corrigan did not even attempt to make, the tax assessment should have been sustained—particularly in light of the fact that Corrigan's connection to Ohio was more than that of a minor investor: he was an 80 percent shareholder in a pass-

through entity that did part of its business in Ohio and he claimed the benefit of material participation in that business for federal income-tax purposes.

{¶ 92} By extension, the tax assessment against the Legg trust as a 35 percent owner of Total Quality Logistics, Inc., a pass-through entity that conducted an Ohio business and owned Ohio-based assets, should be sustained here inasmuch as the tax is, by statute, already limited to the portion of gain related to that company's Ohio business or to its physical assets located in Ohio.

{¶ 93} It should be the trust's burden to establish a due-process violation, not the state's burden to justify imposing the tax in accordance with the statute. In *Corrigan*, we distorted the presumption, and we should correct that error by overruling that case now.

Corrigan—*workability*

{¶ 94} Because *Corrigan* reverses the usual burden regarding the constitutionality of tax statutes, it will defy workability over the long haul. Quite simply, the tax commissioner should be able to enforce state law with the burden being on the taxpayer to prove any constitutional infirmity.

{¶ 95} I am concerned that *Corrigan* sets the stage for difficulty in later cases. What if Legg had moved out of Ohio before he formed the trust? What if he had ceased his activity in conducting the business a year or more before putting the shares into the trust? As time goes on, the shadow cast by *Corrigan* will require us to make ever finer and more hypertechnical distinctions that are not themselves required by the statutes.

Corrigan—*no reliance*

{¶ 96} Finally, I believe that the immediate overruling of *Corrigan* is appropriate precisely because its precedent is so recent. Our constitutional doctrine should be repaired before the legislature has changed the statutes and private parties have ordered their affairs in reliance on its holding.

*Conclusion*

**{¶ 97}** I would overrule *Corrigan* and hold that the trust has failed to show either that the gain to be taxed lacked a sufficient connection to Ohio or that the statutory allocation does not fairly reflect values associated with the protections afforded by Ohio. I would also reject the due-process challenge in this case because the presumption of the tax's constitutionality has not been rebutted. In all other respects, I concur in the majority opinion.

———————————

Bingham Greenebaum Doll, L.L.P., Mark A. Loyd, Reva D. Campbell, and Bailey Roese, for appellant.

Michael DeWine, Attorney General, Daniel W. Fausey, Barton A. Hubbard, and Raina M. Nahra, Assistant Attorneys General, for appellee.

———————————