[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *VVF Intervest, L.L.C. v. Harris*, Slip Opinion No. 2025-Ohio-5680.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-5680

VVF INTERVEST, L.L.C., APPELLEE AND CROSS-APPELLANT, *v.* HARRIS, TAX COMMR., APPELLANT AND CROSS-APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *VVF Intervest, L.L.C. v. Harris*, Slip Opinion No. 2025-Ohio-5680.]

*Taxation—Commercial-activity tax ("CAT")—R.C. 5751.033(E) is constitutional—Situs of gross receipts—Corporation not entitled to refund of CAT it paid on gross receipts it earned when it sold property to a purchaser who had the corporation transport the property to a distribution center in Ohio and then later resold the property and shipped it out of state to fulfill the resale—Board of Tax Appeals' decision reversed.*

(No. 2023-1296—Submitted April 1, 2025—Decided December 24, 2025.)

APPEAL and CROSS-APPEAL from the Board of Tax Appeals, No. 2019-1233.

_____

SHANAHAN, J., authored the opinion of the court, which FISCHER, DEWINE, BRUNNER, DETERS, and HAWKINS, JJ., joined. KENNEDY, C.J., dissented, with an opinion.

**SHANAHAN, J.**

{¶ 1} Appellee and cross-appellant, VVF Intervest, L.L.C., filed a refund claim with appellant and cross-appellee, Patricia Harris, the tax commissioner of Ohio, requesting a refund of taxes it had paid under Ohio's commercial-activity tax ("CAT"). VVF argued that it was entitled to the refund because a portion of the property that it had sold to its purchaser, High Ridge Brands ("HRB"), was shipped to Ohio but was later shipped to HRB's own purchasers outside Ohio, thereby removing the tax commissioner's authority to tax the gross receipts VVF earned from selling the property. In the parlance of the CAT, VVF posited that its gross receipts lacked an Ohio situs. The tax commissioner denied VVF's claim, and the Board of Tax Appeals reversed the tax commissioner's decision. The tax commissioner then brought this appeal, arguing that the CAT's situsing statute required that VVF's gross receipts be sitused to Ohio. VVF cross-appealed, raising two arguments. First, VVF argues that the board incorrectly concluded that it had failed to preserve an alternative statutory argument in support of its refund claim. Second, VVF argues that if this court concludes that the refund claim fails on statutory grounds, then we must conclude that imposing the CAT against VVF on the facts of this case violates the United States Constitution.

{¶ 2} Because VVF's sales in question are properly situsable to Ohio, we reverse the board's decision. We also dismiss VVF's alternative statutory argument and reject its constitutional arguments on the merits.

2

## I. BACKGROUND

*A. Legal background*

{¶ 3} The CAT is levied "on each person with taxable gross receipts for the privilege of doing business in this state." R.C. 5751.02(A). Subject to exceptions not applicable here, "gross receipts" are defined as "the total amount realized by a person, without deduction for the cost of goods sold or other expenses incurred, that contributes to the production of gross income of the person." R.C. 5751.01(F).

{¶ 4} For CAT purposes, "taxable gross receipts" are "gross receipts sitused to this state under [R.C. 5751.033]." R.C. 5751.01(G). But "[b]ecause business is conducted across state and international boundaries, imposing the tax often raises the thorny issue of how to properly allocate receipts to Ohio for taxation." *Defender Sec. Co. v. McClain*, 2020-Ohio-4594, ¶ 18. To help navigate this issue, the General Assembly enacted R.C. 5751.033(E),[1] which instructs:

> [1] Gross receipts from the sale of tangible personal property shall be sitused to this state if the property is received in this state by the purchaser. [2] In the case of delivery of tangible personal property by motor carrier or by other means of transportation, the place at which such property is ultimately received after all transportation has been completed shall be considered the place where the purchaser receives the property. [3] For purposes of this section, the phrase "delivery of tangible personal property by motor

---

1. R.C. 5751.033(E) has been amended and now includes an exception, which is set forth in R.C. 5751.033(M) as follows: "Gross receipts from the sale or lease of a motor vehicle . . . by a motor vehicle dealer licensed under Chapter 4517. of the Revised Code or the law of another state, shall only be sitused to this state if the motor vehicle is issued a certificate of title evidencing the owner's or lessee's address in this state." 2024 Am.Sub.H.B. No. 315.

Although the amendment applies retroactively, *see* 2024 Am.Sub.H.B. No. 315, Section 22, no party in this case has asked us to apply R.C. 5751.033(M) and it does not affect the outcome of this case.

carrier or by other means of transportation" includes the situation in which a purchaser accepts the property in this state and then transports the property directly or by other means to a location outside this state. [4] Direct delivery in this state, other than for purposes of transportation, to a person or firm designated by a purchaser constitutes delivery to the purchaser in this state, and direct delivery outside this state to a person or firm designated by a purchaser does not constitute delivery to the purchaser in this state, regardless of where title passes or other conditions of sale.

### B. Factual background

{¶ 5} VVF describes itself as a contract manufacturer of various brands of personal-care products. As a contract manufacturer, VVF receives a fee from the brands' owners for making products for them. This case pertains to VVF's relationship with HRB, which is the brand owner of products such as Zest bar soap. HRB is an "asset light" entity, typified by ownership of intellectual property and inventory rather than manufacturing facilities. HRB contracted with VVF to manufacture bar soap on its behalf, which VVF did at its manufacturing facility in Kansas City, Kansas.

{¶ 6} From January 1, 2010, through December 31, 2014, VVF paid the CAT on the gross receipts it earned from selling the manufactured bar soap to HRB. But it later filed a refund claim with the tax commissioner, asserting that it should not have paid the tax, because the receipts lacked an Ohio situs. VVF's requested refund totaled $349,532, roughly $327,000 of which traced to its sales to HRB.[2]

---

2. The tax commissioner's final determination erroneously described the total amount sought by VVF as $249,532.

{¶ 7} VVF posited that although the bar soap that it manufactured and sold to HRB was initially transported to a third-party Columbus distribution center, the bar soap eventually left Columbus for placement with out-of-state retailers; thus, it said, the situs of its gross receipts fell outside Ohio. The tax commissioner rejected this argument in her final determination, reasoning that when the bar soap left the Columbus distribution center, it did so as a result of a "second sale" by HRB to one of the out-of-state retailers. As the tax commissioner explained, "the sale at issue . . . is the first sale, the sale from [VVF] to [HRB]. [VVF], in attempting to situs its product sales based upon a subsequent sale of the products where [HRB] sells the product is looking at the wrong sale." VVF appealed to the board, which held an evidentiary hearing.

{¶ 8} VVF provided hearing testimony from three witnesses, who provided further details on how VVF shipped HRB's product out of Kansas City, what HRB did with the product after it arrived at the Columbus distribution center, and how VVF calculated its requested refund. The testimony established that after VVF manufactured the product, it would let HRB know that the product was ready for transport. HRB would then direct a third-party carrier to pick the product up at VVF's facility, and VVF would load the product onto the truck. VVF prepared the bill of lading and thus knew that the truck was headed to the Columbus distribution center. After the product arrived at the Columbus distribution center, HRB would wait to receive purchase orders from large national retailers (e.g., Target, Walmart). After receiving an order, HRB would engage a third-party carrier to transport the product to the retailer's distribution center.

{¶ 9} VVF did not initially know where the product was headed after it left Columbus in fulfilment of HRB's own sale—that is, HRB's resale (or the second sale). Rather, VVF gained this knowledge in preparing its refund claim, with assistance from HRB. The information provided by HRB to VVF showed that 96.9 percent of the product that entered the Columbus distribution center was eventually

transported outside Ohio. Typically, the product would remain in the distribution center for about two months before being transported outside Ohio in fulfillment of HRB's resale. If, say, Target or Walmart had an issue with the shipment it received from HRB, it would contact HRB, not VVF.

{¶ 10} The Board of Tax Appeals, in a divided decision, determined that the tax commissioner wrongly denied VVF's refund claim for gross receipts it made from selling the bar soap to HRB.[3] In rejecting the tax commissioner's second-sale argument, the board concluded that the Columbus delivery point was not the final destination for the goods but was "just one leg of HRB's transportation and continuous delivery process" that terminated outside Ohio. The board also rejected the tax commissioner's argument that situsing determinations should be made based on VVF's knowledge at the time of the sale to HRB, reasoning that it would not be proper to situs the gross receipts to Ohio (even if that was not the ultimate destination of the property) simply because that is where VVF knew the property was headed at the time of shipment. The board further determined that VVF had not adequately preserved an argument relying on R.C. 5751.033(I) (pertaining to the situsing of services), because VVF had not raised that argument in its notice of appeal to the board.[4] Last, the board declined to reach VVF's constitutional arguments, observing that it lacked jurisdiction to do so.

{¶ 11} One board member dissented from the majority's rejection of the tax commissioner's second-sale argument, reasoning that the majority had erroneously expanded the scope of R.C. 5751.033(E) to account for purchasers further down the

3. The board also determined that VVF had failed to meet its burden to show entitlement to a refund with respect to transactions it conducted with Dollar General. VVF has not challenged this aspect of the board's decision.

4. Oddly, however, despite determining that VVF had failed to preserve an argument relying on R.C. 5751.033(I), the board went on to determine that VVF's argument relying on Adm.Code 5703-29-17(C)(15), which implements R.C. 5751.033(I) with respect to contract-manufacturing services, failed on the merits.

supply chain (i.e., the out-of-state retailers to whom HRB sold the product that it purchased from VVF). She would have confined the analysis under the statute to where HRB took delivery as the purchaser, not to where HRB's customers took delivery.

{¶ 12} The tax commissioner then brought this appeal, and VVF cross-appealed.

## II. ANALYSIS

{¶ 13} Our task is to determine whether the board's decision was reasonable and lawful. *See* R.C. 5717.04; *Adams v. Harris*, 2024-Ohio-4640, ¶ 23.

### A. R.C. 5751.033(E) requires that VVF's gross receipts from selling property to HRB be sitused to Ohio

{¶ 14} The tax commissioner's lone proposition of law, which she has divided into two subarguments, centers on the meaning of R.C. 5751.033(E). A dispute over the meaning of a statute presents a question of law, and this court reviews such questions de novo. *See Progressive Plastics, Inc. v. Testa*, 2012-Ohio-4759, ¶ 15. And

> [t]he determination of situs under the statutory standard involves an "'inference of an ultimate fact'" from the basic facts shown by the evidence. *Marc Glassman, Inc. v. Levin*, 119 Ohio St.3d 254, 2008-Ohio-3819, 893 N.E.2d 476, ¶ 7, quoting *Ace Steel Baling, Inc. v. Porterfield*, 19 Ohio St.2d 137, 142, 249 N.E.2d 892 (1969). And the reasonableness of the inference from basic facts to an ultimate fact is a question of law on review. *SFZ Transp., Inc. v. Limbach*, 66 Ohio St.3d 602, 604-605, 613 N.E.2d 1037 (1993).

*Defender Sec.*, 2020-Ohio-4594, at ¶ 20 (addressing a CAT-refund claim).

### 1. Second-sale theory

{¶ 15} For her first subargument, the tax commissioner argues that the board erroneously sitused VVF's gross receipts outside Ohio by combining the transportation route associated with VVF's sales of bar soap to HRB (i.e., the first sale) with the transportation route associated with HRB's sales of that bar soap to out-of-state retailers (i.e., the second sale), thereby treating the soap's delivery location as the place where the out-of-state retailers received it, not the Columbus distribution center. As the board viewed it, ultimate delivery to HRB did not end at the Columbus distribution center, because that location was merely one leg of a continuous delivery process that terminated outside Ohio when the goods were received by the retailers. Rejecting this logic, the tax commissioner reasons that when HRB transported the property out of the Columbus distribution center in fulfillment of its sale to an out-of-state retailer, it broke the chain of transportation associated with the sale by VVF to HRB. By considering the transportation involved in HRB's sales to out-of-state retailers, the tax commissioner suggests, the board overlooked VVF's commercial activity and wrongly shifted the focus to HRB's commercial activity. We agree with the tax commissioner.

{¶ 16} Our analysis must begin with the relevant statutory language. *State v. Bertram*, 2023-Ohio-1456, ¶ 11. We do not ask what the General Assembly intended to enact but what the meaning is of that which it did enact. *Total Renal Care, Inc. v. Harris*, 2024-Ohio-5685, ¶ 13. What the statute's words convey within their proper context is what they mean. *Great Lakes Bar Control, Inc. v. Testa*, 2018-Ohio-5207, ¶ 9. We eschew questions of tax policy in ascertaining the meaning of a tax law. *Stingray Pressure Pumping, L.L.C. v. Harris*, 2023-Ohio-2598, ¶ 22.

{¶ 17} R.C. 5751.033(E) prescribes when a taxpayer must situs to Ohio the gross receipts that it earns from selling tangible personal property. As the first sentence of division (E) makes clear, if the property sold by the taxpayer is received

in Ohio "by the purchaser," then the taxpayer shall situs the gross receipts earned from that sale to Ohio. Due to the vagaries of where property might travel before being received by the purchaser, the General Assembly instructed in division (E)'s second sentence that "the place at which such property is ultimately received after all transportation has been completed shall be considered the place where the purchaser receives the property." *Id.* Division (E)'s third sentence clarifies that if a "purchaser accepts the property in this state" but then transports it out of state, the property shall be sitused outside Ohio. *Id.* Throughout, R.C. 5751.033(E) requires that the situsing inquiry focus on the reception or acceptance of property by "*the* purchaser," not "*a* purchaser." The statute does not define "purchaser," but the word is ordinarily understood to mean "one that acquires property for a consideration (as of money)," *Webster's Third New International Dictionary* (2002).

{¶ 18} R.C. 5751.033(E) states that gross receipts shall be sitused to this State "if the property is received in this state by the purchaser." "Received" refers to the purchaser's act of taking possession after transportation has been completed, as the following sentence from the statute confirms: "In the case of delivery of tangible personal property by . . . means of transportation, the place at which such property is ultimately received after all transportation has been completed shall be considered the place where the purchaser receives the property." *Id.* The statute goes on to say that "'delivery of tangible personal property by . . . means of transportation' includes the situation in which a purchaser accepts the property in this state and then transports the property directly or by other means to a location outside this state." *Id*. Situs is tied to receipt.

{¶ 19} In this case, the board's analysis did not account for the statute's focus on where the purchaser received the property from the seller. Because HRB received the property it purchased from VVF at the distribution center in Ohio, the property was "received in this state by the purchaser," R.C. 5751.033(E). The gross

receipts from that sale are properly sitused to Ohio. To hold otherwise would collapse two separate sales—VVF's sale to HRB and HRB's resale—into one continuous transaction, a conflation the statute does not permit.[5]

{¶ 20} Instead of properly focusing on the purchaser's receipt of the products, the board looked to HRB's later action of shipping the goods to its purchasers. However, R.C. 5751.033(E) directs attention to where the purchaser receives the property from the seller—not where the purchaser may subsequently send it as a result of a subsequent sale.

{¶ 21} R.C. 5751.033(E) does not speak in terms of an ultimate-delivery location in relation to end users. Rather, it concentrates the analysis on where the *purchaser* ultimately received the property from the taxpayer. And here, that location is Ohio. After HRB received the goods in Columbus, it assumed full control over the property, including the responsibility for directing subsequent deliveries to third parties. At that point, HRB ceased to act in the capacity of purchaser in relation to VVF and began acting as a seller in a second transaction. Therefore, for the purposes of situsing VVF's gross receipts, HRB's role as a purchaser concluded at the point of its receipt of the property in Ohio.

{¶ 22} Our decision more than 50 years ago in *House of Seagram, Inc. v. Porterfield,* 27 Ohio St.2d 97 (1971), which addressed nearly identical statutory language in the corporate-franchise-tax context, confirms this understanding and is instructive here. The statute at issue in that case provided:

> "(I) To the extent that the value of business done in this state is measured by sales of tangible personal property, it shall, for the purpose of this section and of Section 5733.03 of the Revised Code,

---

5. The situation here is clearly different from that in another case currently pending before this court, *Jones Apparel Group/Nine West Holdings v. Harris*, case No. 2023-1288. In that case, the purchaser (DSW, Inc.) shipped goods it received in Ohio to its own retail stores nationwide; it did not resell the goods to independent retailers, as HRB did here.

mean sales where such property is received in this state by the purchaser. (II) In the case of delivery of tangible personal property by common carrier or by other means of transportation, the place at which such property is ultimately received after all transportation has been completed shall be considered as the place at which such property is received by the purchaser. (III A) Direct delivery in this state, other than for purposes of transportation, to a person or firm designated by a purchaser constitutes delivery to the purchaser in this state and (III B) direct delivery outside this state to a person or firm designated by a purchaser does not constitute delivery to the purchaser in this state, regardless of where title passes or other conditions of sale."

(Parenthetical sentence numbering added in *House of Seagram*.) *Id.* at 99, quoting now former R.C. 5733.05, Am.Sub.S.B. No. 55, 133 Ohio Laws, Part I, 126, 127 (effective Oct. 2, 1969).

{¶ 23} There, an out-of-state distributor sold liquor to Ohio's liquor agency and delivered it through a common carrier selected by the agency. The delivery ended at an Ohio warehouse. The tax commissioner issued a corporate-franchise-tax assessment against the distributor on the ground that the distributor's sales to the agency constituted business done in Ohio. The distributor objected, invoking language from the corporate-franchise-tax statute at issue in that case—language that is also found in the fourth sentence of R.C. 5751.033(E). According to the distributor, because it had made direct delivery outside this State to the agency's designee (i.e., the common carrier), it had not effected a delivery to the agency in Ohio, regardless of where title to the liquor passed.

{¶ 24} This court rejected that argument, concluding that the distributor had done business in Ohio by way of the sale to the agency. The court acknowledged

that when goods are delivered outside Ohio, without more, no delivery in Ohio has occurred. But that acknowledgement did not result in a decision in the distributor's favor, because in that case, the liquor did not remain outside Ohio—it was delivered by the common carrier to the agency's warehouse in Ohio. As the court held, when a taxpayer sells "tangible personal property to an Ohio buyer, delivered by the [taxpayer] to a common carrier outside Ohio and ultimately received in Ohio after all transportation has been completed," the taxpayer has conducted business in Ohio "regardless of whether the buyer or the [taxpayer] has designated the common carrier." *Id.* at syllabus.

{¶ 25} The reasoning in *House of Seagram* accords with the former corporate-franchise-tax statute's plain language. The court gave effect to each sentence of the provision: it recognized that the first sentence ("Part (I)") establishes the general rule that situs lies where the property is received by the purchaser; that the second sentence ("Part (II)") defines that place as where the property is ultimately received after transportation is complete; that the first part of the third sentence ("Part (III A)") clarifies that when a purchaser accepts the property in Ohio and then immediately transports it outside the State, the situs lies outside Ohio; and that the second part of the third sentence ("Part (III B)") makes "clear that where direct delivery out of Ohio is made to a person or firm designated by the purchaser, including an Ohio purchaser, *that* particular act of delivery, without more, 'does not constitute delivery to the purchaser in this state." (Emphasis added.) *Id.*, 27 Ohio St.2d at 100. The court concluded that when property is ultimately received in Ohio by the purchaser, even if it was first placed with a common carrier outside Ohio, the receipt occurs in Ohio and the sale is sitused in Ohio. *Id.* at 101. The dissent in this case concludes that *House of Seagram* was "wrongly decided" and that the court's interpretation of the statute at issue in that case was "untethered from the text of the statute," dissenting opinion, ¶ 79, but that conclusion rests on an isolated reading of Part (III B), which is just

one portion of the statute at issue in that case. The court in *House of Seagram* interpreted the statutory sentences in sequence, giving each operative force.

{¶ 26} Like *House of Seagram*, this case involves a sale by an out-of-state taxpayer to a purchaser, with the taxpayer transferring the property to the purchaser's designee in a location outside Ohio (Kansas City) for delivery in Ohio (Columbus). *House of Seagram* directs that VVF's sale to HRB be sitused to Ohio because that is where the property was ultimately received after all transportation was completed.

{¶ 27} While the facts here introduce the additional circumstance that the purchaser later moved the goods out of state, that postdelivery movement does not alter where the purchaser received the goods from the seller. The statutory analysis does not follow the goods indefinitely; it stops when the seller's delivery obligation is fulfilled and the purchaser receives the property.

{¶ 28} The dissent questions whether *House of Seagram* was correctly decided, suggesting that this court departed from the statutory text in that case. Dissenting opinion at ¶ 79. But the court in *House of Seagram* interpreted the statute as a whole, explaining that Part (III B) "does not negate" Parts (I) and (II) but, rather, complements them by clarifying circumstances in which goods merely pass through Ohio. 27 Ohio St.2d at 100-101. This demonstrates that the sentences of a statute must be read together, not in isolation. In contrast, the dissent emphasizes later sentences of R.C. 5751.033(E) without addressing the opening directive, which establishes the starting point for analysis: where *the purchaser* receives the goods. The subsequent sentences elaborate on that principle rather than override it.

{¶ 29} Although the dissent acknowledges the first sentence of R.C. 5751.033(E), it builds its analysis around the final sentence, which it treats as controlling. In doing so, the dissent reads the final sentence as having more importance than the other sentences, rather than reading all four sentences together.

In the dissent's view, delivery—and thus receipt—occurs at the moment the goods are loaded onto the purchaser-designated motor carrier, because at that point, the seller's "hands [are] off the products" and the purchaser "is deemed to have picked up [the] goods." Dissenting opinion at ¶ 81. The difficulty with this approach is that it renders the preceding sentences of R.C. 5751.033(E) largely irrelevant. If the last sentence controls, then there is no point to the following language in R.C. 5751.033(E): "[T]he place at which [tangible personal property delivered to a purchaser by transportation] is ultimately received after all transportation has been completed shall be considered the place where the purchaser receives the property."

{¶ 30} The dissent mentions the second sentence but does not give it operative effect, instead treating the fourth sentence as overriding the second sentence's explicit directive to determine situs where the purchaser ultimately receives the property. *See* dissenting opinion at ¶ 80. Read in sequence, the sentences of R.C. 5751.033(E) require situsing based first on where the purchaser receives the goods. Here, HRB received the goods in Columbus, and the goods were not transported "directly" to an out-of-state location. Instead, the goods remained in a warehouse until HRB, now acting as a seller, arranged delivery to *its* own purchasers.

{¶ 31} By focusing on its individual sentences rather than R.C. 5751.033(E) as a whole, the dissent illustrates what has been described as a "common" "interpretive fault"—"the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts," Scalia and Garner, *Reading Law: The Interpretation of Legal Texts*, 167 (2012).

{¶ 32} In this case, HRB received the goods and warehoused them in Ohio. When HRB later resold them, that resale was a separate transaction and not part of the situs inquiry for VVF's sale. The third sentence of R.C. 5751.033(E) clarifies— rather than overrides—the statutory focus on the purchaser's initial receipt of the

14

goods. The scenario in this case is distinct from cases in which goods are accepted in Ohio solely for purposes of immediate transportation outside the State. Here, the goods were stored in Ohio and were later moved only to fulfill HRB's resales, which does not alter where HRB received them from VVF.

{¶ 33} VVF argues that adopting the tax commissioner's reading of R.C. 5751.033(E) risks converting the CAT from a privilege-of-doing-business tax into a transactional tax. In the words of VVF, "the Tax Commissioner's focus on HRB's subsequent transactions merely distracts from what should be the focus—determining the value of VVF's Ohio business over a period of time measured by market access." This argument fails. It is true that the CAT is a privilege-of-doing-business tax and "is computed using a broad measure of market access that is rationally related to the enjoyment of the privilege of doing business." *Ohio Grocers Assn. v. Levin*, 2009-Ohio-4872, ¶ 14, 49. But it is also true that we have described the CAT as using gross receipts as the measuring stick to value that privilege. *Id.* at ¶ 1, 17-18. And the CAT explicitly provides that gross receipts include amounts realized from sales of the taxpayer's property to another. R.C. 5751.01(F)(1)(a). Thus, to measure the value of VVF's privilege of doing business, the CAT directs that VVF's sales must be accounted for. Necessarily then, an analysis that accounts for HRB's sales to out-of-state retailers—which is where VVF's argument ultimately leads—would not accurately reflect the scope of VVF's commercial activity; rather, it would blur the distinction between VVF's and HRB's commercial activity. It follows that by distinguishing between VVF's sales activity to HRB and HRB's sales activity to out-of-state retailers, an accurate measure of VVF's commercial activity may be arrived at.

{¶ 34} VVF argues that the tax commissioner's argument cannot be squared with R.C. 5751.40, which is a provision of the CAT pertaining to qualified distribution centers ("QDCs"). To receive a certificate as a QDC, the operator of a distribution center must pay an annual fee of $100,000, R.C. 5751.40(F), and show

for the relevant time period that more than 50 percent of the cost of the property shipped by suppliers to the center is situasable outside Ohio under R.C. 5751.033(E) and the costs of the suppliers' property shipped to the center are at least $500 million, R.C. 5751.40(B)(1). A supplier that ships property to the QDC is not subject to a tax on "qualifying distribution center receipts," R.C. 5751.40(D), which are defined as the supplier's receipts from property shipped to the QDC "multiplied by a quantity that equals one minus the Ohio delivery percentage," R.C. 5751.40(A)(1). The "Ohio delivery percentage" reflects the proportion of property delivered inside Ohio from the QDC to that delivered everywhere from the QDC. R.C. 5751.40(A)(7).

{¶ 35} There is no question here that VVF's products were not delivered to a QDC. Even so, VVF reads the QDC provision as signaling the General Assembly's intent to treat products passing through an Ohio distribution center solely for further shipment as not situasable to the distribution center's location. In other words, because of the QDC provision, VVF reasons that its gross receipts should not be sitused to Ohio, because the property it sold to HRB to earn those gross receipts eventually left the distribution center for placement outside Ohio. But if the General Assembly wanted to achieve the result that VVF urges, the General Assembly would not have imposed conditions on who can qualify as a QDC and who can claim the tax benefits of transporting goods to a QDC. If, as a matter of policy, the QDC provision's scope is to be enlarged, then the General Assembly must be the one to do so. *See Kaminski v. Metal & Wire Prods. Co.*, 2010-Ohio-1027, ¶ 59 (the legislative branch of government is the ultimate arbiter of public policy).

## 2. Contemporaneous knowledge

{¶ 36} The tax commissioner's second subargument in support of her proposition of law contends that the board erred in determining that R.C. 5751.033(E) does not require contemporaneous knowledge by the taxpayer of the

property's ultimate destination at the time of transportation. Because we have determined that VVF's gross receipts are properly situsable to Ohio, we do not need to address this argument.

### B. VVF did not preserve its argument under R.C. 5751.033(I)

{¶ 37} VVF's first proposition of law in its cross-appeal asserts that it properly preserved its argument in support of its refund claim predicated on R.C. 5751.033(I), which prescribes the CAT's standard for situsing gross receipts from sales of services. VVF's notice of appeal to the board, however, did not refer to this division of the statute. Rather, it referred to R.C. 5751.033(E) and various constitutional provisions. The board thus concluded that because VVF failed to raise R.C. 5751.033(I) in its notice of appeal, that division of the statute was not properly before it. VVF challenges the board's determination, arguing that its notice of appeal provided fair notice of its argument under R.C. 5751.033(I). In response, the tax commissioner insists that the board correctly declined to address VVF's R.C. 5751.033(I) argument.

{¶ 38} R.C. 5717.02 establishes the requirements for filing a notice of appeal with the board. The requirements are jurisdictional. *See, e.g., Ellwood Engineered Castings Co. v. Zaino*, 2003-Ohio-1812, ¶ 20. Before 2013, the statute provided that the notice of appeal had to "specify the errors . . . complained of," 2011 Sub.H.B. No. 225, which this court had construed as "requiring a notice of appeal to set out the errors in definite and specific terms," *Obetz v. McClain*, 2021-Ohio-1706, ¶ 21. But in 2013, the General Assembly amended the statute to provide that "[a] notice of appeal [to the board] shall contain a short and plain statement of the claimed errors in the determination . . . of the tax commissioner . . . showing that the appellant is entitled to relief and a demand for the relief to which the appellant claims to be entitled." R.C. 5717.02(C). By removing the specification-of-error requirement from the statute, the court in *Obetz* concluded, the General Assembly had "eliminated a procedural pitfall requiring unwary

taxpayers to provide a laundry list of errors and thereby helped to ensure that tax appeals are decided on their merits—not denied because of a technical defect." *Obetz* at ¶ 21.

{¶ 39} As *Obetz* explains, a taxpayer's notice of appeal under R.C. 5717.02(C) need not contain a "full legal argument or specific reasoning" to preserve a claim of error for review. *Id.* at ¶ 22. Rather, "fair notice" of the argument will suffice. *Id.* But even in view of the relaxed assignment-of-error standard that the statute now embodies, we do not see how VVF's notice of appeal contained a short and plain statement showing that it was entitled to relief under R.C. 5751.033(I). That division of the statute applies to situsing gross receipts from sales of services, whereas R.C. 5751.033(E), which is the division that VVF *did* raise in its notice of appeal, applies to situsing gross receipts from sales of property. While VVF was not required to detail in its notice of appeal the legal argument it intended to assert under R.C. 5751.033(I), it was required to provide fair notice that it was placing the portion of the statute pertaining to situsing sales of services at issue. Rather than provide fair notice relating to the situsing of services, VVF provided no notice relating to that issue.

{¶ 40} We dismiss VVF's first proposition of law in its cross-appeal for lack of jurisdiction.

### C. R.C. 5751.033 is constitutional

{¶ 41} The second, third, and fourth propositions of law advanced in VVF's cross-appeal assert that three distinct constitutional violations will arise if this court holds that it is not entitled to a CAT refund for the transactions at issue. VVF anchors these allegations in the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Commerce Clause of the United States Constitution, U.S. Const., art. I, § 8, cl. 3; and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. A party that attacks the constitutionality of a statute must overcome the presumption that the statute is

18

constitutional. *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Commt.*, 2018-Ohio-3220, ¶ 26. Although VVF does not expressly couch its claim in terms of an as-applied constitutional challenge, that is the crux of its argument. An as-applied challenge requires the challenger to present clear and convincing evidence of the statute's constitutional defect. *Id*. As explained below, VVF's constitutional arguments fail.

### 1. Due Process Clause

{¶ 42} VVF argues that imposing the CAT on it for the transactions at issue violates the Due Process Clause because the connection between it and Ohio is too attenuated to permit the exercise of the State's taxing power. In support of this argument, VVF observes that it had no physical presence in and directed no marketing activities toward Ohio; title and risk of loss to the property passed to HRB in Kansas upon delivery to HRB's designated carrier; HRB selected the third-party distribution center in Columbus; and VVF's communications with HRB took place in Kansas or Connecticut. According to VVF, the only connection it had to Ohio was the knowledge that its products would end up in Ohio.

{¶ 43} The Fourteenth Amendment to the United States Constitution forbids a state from depriving "any person of life, liberty, or property, without due process of law." A two-step analysis applies in determining whether a state tax passes muster under the Due Process Clause. First, there must be some definite link or minimum connection between the state and the person, property, or transaction that the state seeks to tax. *T. Ryan Legg Irrevocable Trust v. Testa*, 2016-Ohio-8418, ¶ 64. And second, the income attributed to the state for tax purposes must be rationally related to values connected with the taxing state. *Id*. VVF claims here that the first part of the test is unmet.

{¶ 44} "A State has the power to impose a tax only when the taxed entity has certain minimum contacts with the State such that the tax does not offend traditional notions of fair play and substantial justice." (Cleaned up.) *North*

*Carolina Dept. of Revenue v. Kimberley Rice Kaestner 1992 Family Trust*, 588 U.S. 262, 269 (2019). Although a corporation's physical presence in the taxing state enhances its contacts with the state, the corporation need not have a physical presence in the state to meet the due-process standard. *See South Dakota v. Wayfair*, 585 U.S. 162, 177 (2018) ("It is settled law that a business need not have a physical presence in a State to satisfy the demands of due process."). The relevant question is whether the out-of-state corporation has purposefully availed itself of the benefits of an economic market in the taxing state. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 307 (1992), *overruled on other grounds by Wayfair* at 188; *see also Corrigan v. Testa*, 2016-Ohio-2805, ¶ 32 ("due process requires that a person whom a state proposes to tax have 'purposefully availed' himself of benefits within the taxing state").

{¶ 45} In attempting to meet its burden to show that the application of the CAT to the transactions at issue in this case is unconstitutional, VVF cites *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987), a products-liability case that addressed the interplay between stream-of-commerce theory and due process. The contours of the stream-of-commerce theory are "far from exact," but it is generally understood to describe "the movement of goods from manufacturers through distributors to consumers." *J. McIntrye Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (lead opinion).

{¶ 46} To begin with, we doubt that *Asahi* provides the proper frame of reference for resolving this tax dispute. "Courts typically do not extend the stream of commerce theory beyond the products liability context or beyond a dispute pertaining to the actual product." 4 Wright and Miller, *Federal Practice and Procedure: Civil*, § 1067.4, fn. 2 (4th Ed. 2025). So too, a leading treatise in the field—Hellerstein and Hellerstein, *State Taxation* (3d Ed. 2019)—omits mention of *Asahi* in its lengthy index of cases cited. Unsurprisingly, then, VVF fails to cite one decision in which a court has struck down on due-process grounds the

application of a state's tax statute based on *Asahi*'s reasoning. But even if *Asahi* can be applied to resolve some tax disputes in a taxpayer's favor, it cannot be applied to resolve this one in VVF's favor.

{¶ 47} In *Asahi*, Cheng Shin, a Taiwanese tire manufacturer, sought indemnification from Asahi Metal Industry Company, Ltd., a Japanese valve-assembly manufacturer, in a California court. Asahi manufactured the valves in Japan and sold and shipped them to Cheng Shin in Taiwan. Asahi was aware that Cheng Shin sold the valves worldwide and that they would end up in California through the stream of commerce. Writing on behalf of herself and three other justices, Justice O'Connor observed that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi* at 112. On the facts presented, she reasoned that California's exercise of jurisdiction over Asahi exceeded the limits of due process. Here, in contrast, VVF did more than place its bar soap in the stream of commerce, leaving it to be swept into Ohio through happenstance. Rather, it prepared the bill of lading specifying that the place of shipment was Ohio and loaded its products onto trucks for transport to Ohio. This case is factually distinct from *Asahi*.

{¶ 48} We reject VVF's due-process argument.

## 2. Commerce Clause

{¶ 49} VVF next claims that the application of the CAT to the transactions in question violates the Commerce Clause. We disagree.

{¶ 50} The United States Constitution empowers Congress "[t]o regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. "Although written as an affirmative grant of power to Congress, the Commerce Clause has long been understood to 'prohibit[] state laws that unduly restrict interstate commerce.' . . . This 'dormant' feature of the Commerce Clause serves as a bulwark against 'protectionist measures' enacted by the States 'and thus preserves a national market

for goods and services.'" (Brackets added in *Rockies Express Pipeline*.) *Rockies Express Pipeline, L.L.C. v. McClain*, 2020-Ohio-410, ¶ 23, quoting *Tennessee Wine & Spirits Retailers Assn. v. Thomas*, 588 U.S. 504, 514 (2019).

{¶ 51} For a state tax to pass muster under the Commerce Clause, it must satisfy the four-part test announced in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977). Under *Complete Auto*, a state tax is valid if it is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* at 279. VVF asserts that as applied to the transactions at issue here, the CAT tax fails the substantial-nexus and fairly related prongs.

### a. Substantial-nexus prong

{¶ 52} VVF argues that its sales activity does not have a substantial nexus with Ohio because it lacks a physical presence in Ohio (no employees, property, or facilities in Ohio), did not control the transportation of products to Ohio, and did not interact with Ohio customers whether through marketing or solicitation. In support of this argument, VVF invokes this court's decision in *Crutchfield Corp. v. Testa*, 2016-Ohio-7760, and the United States Supreme Court's decision in *Wayfair*, 585 U.S. 162.

{¶ 53} In *Crutchfield*, the taxpayer had no personnel or facilities in Ohio. It sold its goods through the internet and over the phone. And when it shipped its goods from outside Ohio to consumers located in Ohio, it did so through third-party carriers. Because it lacked a physical presence in Ohio, the taxpayer argued that its activity lacked a substantial nexus with Ohio, thereby barring Ohio from levying the CAT on its gross receipts. *Crutchfield* at ¶ 1. This court disagreed. The court held that while physical presence was a sufficient condition for finding a substantial nexus, it was not a necessary condition. *Id.* at ¶ 42-43 (distinguishing *Quill*, 504 U.S. 298, and further distinguishing the CAT from sales and use taxes). But the court clarified that a quantitative threshold was needed to ensure that the CAT

22

would not impose excessive burdens on interstate commerce through its application to remote sellers with modest sales volumes. *Crutchfield* at ¶ 52-54. The $500,000-sales-receipts threshold prescribed by the General Assembly, the court explained, was adequate protection against this concern. *Id.* at ¶ 56.

{¶ 54} In *Wayfair*, the United States Supreme Court definitively resolved what this court had anticipated in *Crutchfield*, overruling *Quill*'s physical-presence requirement and holding that the Commerce Clause was not a barrier to a state's exercise of its taxing authority over an out-of-state seller that lacked a physical presence in the taxing state. *Wayfair* at 188-189 (addressing a state's sales-tax law that required remote sellers to collect tax on their sales to in-state purchasers). Much like in *Crutchfield*, the taxpayers in *Wayfair* had no physical presence in the taxing state; rather, they transacted business over the internet.

{¶ 55} *Crutchfield* and *Wayfair* foreclose VVF's attempt to establish a Commerce Clause violation based on its lack of physical presence in Ohio. And VVF otherwise fails to cite a doctrine in support of its claim that the Commerce Clause bars a state from taxing a remote seller that did not control the shipment into the taxing state. What remains to be decided is VVF's argument predicated on an absence of Ohio-customer interaction. VVF does not dispute that its sales activity clears the $500,000 threshold. But it posits that despite its significant sales of property that was shipped to Ohio, its sales nevertheless lack a substantial nexus with Ohio due to its lack of interaction with Ohio customers.

{¶ 56} We do not read *Crutchfield* or *Wayfair* as articulating a bright-line rule requiring that an out-of-state seller have interacted with an in-state customer before a substantial nexus may be found. To be sure, those decisions illustrate the paradigmatic method of conducting business in today's internet age, whereby a remote internet seller interacts with a purchaser through a website and transmits the purchased good to the purchaser in the taxing state in fulfillment of the sale. But as this case well illustrates, sellers of goods have devised other methods of doing

business in a state without ever stepping foot in the state. *See Wayfair*, 585 U.S. at 177, quoting *Quill*, 504 U.S. at 308, quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("""it is an inescapable fact of modern commercial life that a substantial amount of business is transacted [with no] need for physical presence within a State in which business is conducted"""). And nothing in either decision expressly forecloses Ohio from taxing, as here, an out-of-state entity that, without interacting with an Ohio customer, ships property to Ohio through a third-party carrier at the direction of its out-of-state customer in fulfillment of a sale.

{¶ 57} VVF's proposed customer-interaction rule is also hard to square with *Wayfair*'s observation that Commerce Clause doctrine must be attuned to economic realities, *id.* at 180 ("The basic principles of the Court's Commerce Clause jurisprudence are grounded in functional, marketplace dynamics; and States can and should consider those realities in enacting and enforcing their tax laws."). Because these types of transactions are so prevalent, this court would expect VVF to cite caselaw to support its position if such support existed and because VVF's position lacks such support, we decline its invitation to announce a rule of law under the Commerce Clause that ignores the realities of modern commerce.

{¶ 58} We reject VVF's substantial-nexus argument.

### b. "Fairly related" prong

{¶ 59} VVF next argues that the taxation of its gross is not fairly related to the benefits and protections provided to it by Ohio. The inquiry under the fair-relation prong is not "the *amount* of the tax of the *value* of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities." (Emphases in original.) *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 625 (1981). Rather, the inquiry is whether the "*measure* of the tax [is] reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to bear a 'just share of state tax burden.'" (Emphasis in original.) *Id.* at 626, quoting *W. Live Stock v. Bur. of*

*Revenue*, 303 U.S. 250, 254 (1938). That is, the tax must be "'tied to the earnings which the State . . . has made possible' " (ellipsis in original), *id.*, quoting *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444 (1940), such that the tax is in "'proper proportion' to [the taxpayer's] activities within the State and, therefore, to [its] 'consequent enjoyment of the opportunities and protections which the State has afforded' in connection with those activities," *id.*, quoting *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 441 (1964). Even though a taxpayer may not directly benefit from the services a state is able to provide because of its collection of a tax, the "advantages conferred by the State's maintenance of a civilized society[] are justifications enough for the imposition of the tax." *Oklahoma Tax Comm. v. Jefferson Lines, Inc.*, 514 U.S. 175, 200 (1995); *see also Goldberg v. Sweet*, 488 U.S. 252, 267 (1989) (observing that "a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisf[y] the requirement that the tax be fairly related to benefits provided by the State to the taxpayer").

{¶ 60} VVF maintains that it is not challenging the percentage of the CAT but is instead challenging the fact that it was asked to pay the CAT at all, because, it says, there was no connection between Ohio and the gross receipts it taxed. In VVF's view, it did "not conduct any activities in or directed at Ohio." Again, invoking *Asahi*, 480 U.S. 102, VVF asserts that at most, it had mere knowledge that its products would end up in Ohio. The true beneficiary of the advantages conferred by Ohio, the argument runs, was HRB.

{¶ 61} For the reasons explained above, VVF's reliance on *Asahi* to support its position fails. Indeed, *Asahi* did not consider the fair-relation prong at all. Nor does VVF cite a case in which a court invalidated a state's tax under the fair-relation prong that involved, as here, an out-of-state taxpayer that sold its product to a company that directed a third-party carrier to pick up the product and transport it to the taxing state. Given the pervasiveness of interstate commerce in this country,

we would (again) expect to see support in the caselaw to bolster VVF's position if that position were correct.

**{¶ 62}** What is more, in focusing on the benefits that Ohio has afforded to HRB, VVF has lost sight of the fact that it was the Ohio marketplace that made VVF's sale to HRB possible, for Ohio is where the distribution center is located. So too, Ohio's roads facilitated the delivery of the bar soap into and across Ohio for placement in that distribution center. By furnishing these advantages, Ohio may justly ask for something in return. *See Commonwealth Edison*, 453 U.S. at 625. And the return sought here is in proper proportion to VVF's activities related to Ohio, for Ohio has sought to tax only those gross receipts that VVF earned from selling to HRB that are situsable to Ohio.

**{¶ 63}** We reject VVF's Commerce Clause challenge predicated on the fair-relation prong of the *Complete Auto* test.

### 3. Equal Protection Clause

**{¶ 64}** For its last constitutional challenge, VVF argues that imposing the CAT on the gross receipts it earned from transacting sales with HRB violates the Equal Protection Clause. As noted earlier, the General Assembly enacted a provision that enables a seller to reduce its gross receipts by a specified percentage for property it sells that is transported to a QDC. VVF, however, did not transact with a QDC, so it could not invoke this reduction. As VVF says, if its hypothetical rival conducted identical operations but transacted with a QDC, then its rival would enjoy a tax advantage that VVF does not. In VVF's view, its inability to invoke the QDC reduction creates an equal-protection problem "because identical operations by similarly situated taxpayers would be taxed differently." We disagree.

**{¶ 65}** The Fourteenth Amendment to the United States Constitution bars a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." Classifications pervade American laws, but the "Equal Protection Clause

does not forbid [them]." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Rather, it forbids "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* If, as in this case, the classification does not involve a suspect class or implicate a fundamental right, then there is no equal-protection violation provided that the classification "bears a rational relationship to a legitimate governmental interest." *Columbia Gas Transm. Corp. v. Levin*, 2008-Ohio-511, ¶ 91. In the tax context, rational-basis review under the Equal Protection Clause is "especially deferential," *Nordlinger* at 11, in view of the "great leeway" that states have in "making classifications and drawing lines that in their judgment produce reasonable systems of taxation," *Columbia Gas* at ¶ 92. VVF "bears the burden to negate every conceivable basis that might support the legislation," *id.* at ¶ 91.

{¶ 66} First, VVF goes astray in asking this court to treat it and its hypothetical rival as similarly situated when in fact they are not. "[T]he Equal Protection Clause 'does not require things which are different in fact . . . to be treated in law as though they were the same.'" (Ellipsis in original.) *GTE N., Inc. v. Zaino*, 2002-Ohio-2984, ¶ 22, quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940). The fact that VVF and its hypothetical rival compete "does not, of itself, mean that the two companies are similarly situated for purposes of equal protection." *Id.* at ¶ 39. Here, at the risk of stating the obvious, VVF and its hypothetical rival are not similarly situated, because VVF's rival dealt with a QDC while VVF did not. And that dissimilarity is the reason for differential tax treatment.

{¶ 67} VVF cites in passing *MCI Telecommunications Corp. v. Limbach*, 1994-Ohio-489, but that case does not compel a different result. There, this court found an equal-protection violation when the tax commissioner had applied different property-valuation methods to different classes of telecommunications providers despite a ruling by the Public Utilities Commission of Ohio that placed the providers in the same category for utility-regulation purposes. VVF reasons

from *MCI* that "when there is no relevant distinction between how different taxpayers conduct their businesses, there cannot be different methods of taxation." But this case is factually distinguishable from *MCI*. The reason for the differential tax treatment here is the distinction in how VVF and its hypothetical rival conduct their business—the rival transacted with a QDC and VVF did not. *See Home Depot USA, Inc. v. Levin*, 2009-Ohio-1431, ¶ 20-21 (rejecting equal-protection challenge predicated on *MCI* based on factual distinctions). Nor is there a regulatory ruling that places VVF and its hypothetical rival in the same category.

{¶ 68} VVF's claim falters for additional reasons. Notwithstanding the absence of record evidence that points to the General Assembly's rationale for enacting the QDC provision, the General Assembly's decision to extend special tax treatment to those who deal with QDCs and withhold it from those who do not can be rationally justified with a plausible policy reason. *See Nordlinger*, 505 U.S. at 15 ("the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification"); *State v. Noling*, 2016-Ohio-8252, ¶ 20, quoting *Nordlinger* at 11 ("the Equal Protection Clause is satisfied if 'there is a plausible policy reason for the classification'").

{¶ 69} One plausible policy reason for enacting the QDC provision could have simply been a desire on the part of the General Assembly to make Ohio a more attractive place to do business for suppliers who transact business with large distribution centers. That desire falls within the heartland of the General Assembly's powers, for "the Constitution grants legislators, not courts, broad authority (within the bounds of rationality) to decide whom they wish to help with their tax laws and how much help those laws ought to provide." *Fitzgerald v. Cent. Iowa Racing Assn.*, 539 U.S. 103, 108 (2003). The General Assembly drew the line that separates suppliers who deal with QDCs from those who do not, and equal-protection doctrine rejects this kind of judicial second-guessing. *See id.*, quoting

*United States RR. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (observing that under the Equal Protection Clause, "'the fact that the line [written into a state's tax law] might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration' ").

{¶ 70} We reject VVF's equal-protection challenge.

### III.  CONCLUSION

{¶ 71} We reverse the decision of the Board of Tax Appeals, dismiss for lack of jurisdiction VVF's first proposition of law in its cross-appeal, and reject the challenges raised under the United States Constitution in the remainder of VVF's propositions of law in its cross-appeal.

Decision reversed.

————————————

**KENNEDY, C.J., dissenting.**

{¶ 72} Ohio's commercial-activity tax does not apply to the sale of goods that are manufactured outside of Ohio when those goods are loaded onto a motor carrier selected by the purchaser before the goods are brought into Ohio.  Nor does it apply when the goods are shipped to a purchaser at a location in Ohio before being transported out of state.  The Board of Tax Appeals correctly ordered a refund of the commercial-activity tax paid by appellee and cross-appellant, VVF Intervest, L.L.C., and I would affirm its decision.  Because the majority does otherwise, I dissent.

{¶ 73} In this case, VVF Intervest manufactured soap products in Kansas and then loaded the products onto a motor carrier chosen by High Ridge Brands ("High Ridge") before the goods were transferred into Ohio.  The motor carrier transported the goods from Kansas to a distribution center in Ohio, and High Ridge then shipped the products to its out-of-state customers.  This case presents the question whether VVF Intervest's sales to High Ridge are subject to Ohio's commercial-activity tax.  In my view, they are not.

**Delivery Outside Ohio**

{¶ 74} The first sentence of R.C. 5751.033(E) states the general rule that "gross receipts from the sale of tangible personal property shall be sitused to this state if the property is received in this state by the purchaser." R.C. 5751.033(E)'s fourth sentence then specifies that "direct delivery outside this state to a person or firm designated by a purchaser does not constitute delivery to the purchaser in this state, regardless of where title passes or other conditions of sale."

{¶ 75} The first and fourth sentences use different words—"received" versus "delivery"—but they are interrelated, because the word "receive" means "to take possession or delivery of." *Webster's Third New International Dictionary* (2002). So when the fourth sentence says that the out-of-state delivery of goods to a third party (such as a trucking company) selected by the purchaser does not constitute *delivery* to the purchaser in Ohio, it necessarily also means that the goods in that situation were not *received* by the purchaser in Ohio. Delivery and receipt in that situation occurred out of state. That is how R.C. 5751.033(E)'s first and fourth sentences fit together.

{¶ 76} Here, VVF Intervest directly delivered its products to a motor carrier designated by High Ridge at a location outside this State. Therefore, VVF Intervest's shipments do not constitute delivery to High Ridge in Ohio. Instead, delivery was made in Kansas. The goods were therefore deemed to have been received by High Ridge in Kansas as well, and the sales cannot be sitused in this State for purposes of liability for the commercial-activity tax.

{¶ 77} The majority relies on this court's decision in *House of Seagram, Inc. v. Porterfield*, 27 Ohio St.2d 97 (1971), to support its conclusion that the situs of VVF Intervest's sales to High Ridge is Ohio. In *House of Seagram*, the court addressed language in Ohio's franchise-tax statute that is similar to the language in R.C. 5751.033(E). The franchise-tax statute provided that "'direct delivery outside this state to a person or firm designated by a purchaser does not constitute delivery

to the purchaser in this state, regardless of where title passes or other conditions of sale.'" *House of Seagram* at 99, quoting R.C. 5733.05.

{¶ 78} In that case, like here, a foreign company loaded goods onto a motor carrier selected by a customer before those goods were brought into Ohio. The court noted that the franchise-tax statute provided that delivery of goods occurs where they are ultimately received by the purchaser after all transportation is completed. That place was Ohio, the court reasoned, so the foreign company was subject to the franchise tax. The court said that the part of the statute relating to direct delivery to a common carrier designated by the purchaser applied in limited situations and was only "a safeguard applicable to a situation where an Ohio purchaser brings goods through Ohio on their way to some ultimate destination outside Ohio, or where such goods, immediately upon receipt, are shipped to some other state by the purchaser and do not even pass through Ohio." *Id.* at 100.

{¶ 79} It is not possible to square *House of Seagram*'s analysis with the language of the franchise-tax statute. The statute provided that a foreign company is not subject to the franchise tax when it delivers goods outside Ohio to a common carrier chosen by the Ohio purchaser. That is the exact fact pattern in *House of Seagram*. The court's interpretation of the franchise-tax statute was so untethered from the text of the statute that it is clear that *House of Seagram* was wrongly decided.

{¶ 80} It is true that, in the words of R.C. 5751.033(E)'s second sentence, the situs is "the place at which [the] property is ultimately received after all transportation has been completed." But R.C. 5751.033(E) qualifies that language by saying that "direct delivery outside this state to a person or firm designated by a purchaser does not constitute delivery to the purchaser in this state." And that qualification makes sense, because when the goods are loaded onto the purchaser's chosen motor carrier, the seller has fulfilled its part of the transaction. So here, at the time VVF Intervest transferred the goods to the motor carrier selected by High

Ridge, its hands were off the products and its role in the transaction was complete. High Ridge received the goods before they entered Ohio. Therefore, VVF Intervest's sales to High Ridge were not subject to the commercial-activity tax during the relevant tax years.

{¶ 81} The majority focuses on where the purchaser of the out-of-state goods *received* them. But that is only the first step. How does one decide where an in-state purchaser received goods that originated out of state? This is where the fourth sentence of R.C. 5751.033(E) comes in. Again, it says that "direct delivery outside this state to a person or firm designated by a purchaser does not constitute delivery to the purchaser in this state." Who delivers the goods and where they are delivered matters. If the out-of-state seller selected the motor carrier that transported the goods to Ohio, then the seller is deemed to have delivered those goods to the purchaser in Ohio. The out-of-state seller's hands stayed on the goods until they reached Ohio. But if the purchaser in Ohio selected the motor carrier, then the purchaser is deemed to have picked up those goods outside Ohio.

{¶ 82} So in this case, because High Ridge designated the motor carrier that picked up the goods in Kansas, delivery occurred there, and that is where High Ridge "assumed full control over the property," to use the majority's words, majority opinion at ¶ 21. Because High Ridge is deemed by the statute to have *received* the goods outside Ohio, the situs of the sales was not Ohio under the first and fourth sentences of R.C. 5751.033(E).

### Goods Passing Through Ohio

{¶ 83} There is an independent reason for holding that the situs of the sales to High Ridge is not Ohio, and it comes from the second and third sentences of R.C. 5751.033(E), which state:

> In the case of delivery of tangible personal property by motor carrier
> or by other means of transportation, the place at which such property

is ultimately received after all transportation has been completed shall be considered the place where the purchaser receives the property. For purposes of this section, the phrase "delivery of tangible personal property by motor carrier or by other means of transportation" includes the situation in which a purchaser accepts the property in this state and then transports the property directly or by other means to a location outside this state.

{¶ 84} Like the fourth sentence, the second and third sentences of R.C. 5751.033(E) qualify the first sentence of the statute. The first sentence sets out the general proposition that the situs of a sale is the place where the goods are received by the purchaser. The second sentence specifies that when the goods are physically transported, then what matters for purposes of situs of the sale is where the goods are received after all transportation is complete. The third sentences then qualifies the second sentence by providing that final delivery does not occur in Ohio when "a purchaser accepts the property in this state and then transports the property directly or by other means to a location outside this state."

{¶ 85} Here too, the plain language of R.C. 5751.033(E) requires VVF Intervest's sales of goods to High Ridge to be sitused outside Ohio. A motor carrier transported the goods, High Ridge accepted the products in Ohio, and it then shipped those products "directly or by other means" to a location outside Ohio. Importantly, the statute does not contain a temporal component establishing how long goods must remain in Ohio before they are deemed to be at their final destination. Therefore, the place where VVF Intervest's products were delivered after all transportation was completed was outside Ohio.

{¶ 86} The majority resists this analysis by saying that the chain of transportation was broken when High Ridge resold VVF Intervest's goods to third parties outside Ohio. Majority opinion at ¶ 15. But R.C. 5751.033(E) anticipates

that goods can be "accept[ed]" by the purchaser in Ohio yet still not be sitused in Ohio. And the majority itself recognizes that the chain of transportation is *not* broken when goods received in Ohio are immediately shipped to third parties outside Ohio; the majority states that "[t]he scenario in this case is distinct from cases in which goods are accepted in Ohio solely for purposes of immediate transportation outside the State." Majority opinion at ¶ 32. The majority's distinction might be persuasive if the third sentence of R.C. 5751.033(E) were modified as follows: "For purposes of this section, the phrase 'delivery of tangible personal property by motor carrier or by other means of transportation' includes the situation in which a purchaser accepts the property in this state and then transports the property directly ~~or by other means~~ [and immediately] to a location outside this state." But that is not what the statute says.

{¶ 87} The third sentence does not apply only when the goods are shipped immediately out of state; it also applies when the goods are transported "directly or by other means." The "by other means" language is broad enough to encompass *indirect* transportation of the goods through the purchaser to the purchaser's out-of-state customers.

{¶ 88} Since VVF Intervest's goods were ultimately received out of state, the situs of the sales of the goods is not Ohio. This result is counterintuitive—the goods were shipped to a purchaser at a location in Ohio. But the result is not so absurd that we can deviate from the literal meaning of the words the General Assembly wrote. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 237 (2012). The General Assembly could have reasonably decided that when products flow through Ohio from a foreign company to the purchaser's out-of-state customers, the foreign company should not be subject to Ohio's commercial-activity tax—just as the foreign company is not subject to the tax when its goods are transported through the State without stopping here.

**{¶ 89}** The General Assembly is the ultimate arbiter of tax policy in this State. *See Pelletier v. Campbell*, 2018-Ohio-2121, ¶ 31. In contrast, "[o]ur role, in exercise of the judicial power granted to us by the Constitution, is to interpret and apply the law enacted by the General Assembly." *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 2012-Ohio-5685, ¶ 29. And when the text of a statute is unambiguous, we have no authority to judicially amend it. *See Pelletier* at ¶ 20.

**{¶ 90}** For these reasons, the Board of Tax Appeals correctly concluded that VVF Intervest's sales to High Ridge were not subject to Ohio's commercial-activity tax. Therefore, I would affirm its decision. The majority does not do that, so I dissent.

_____

Buckingham, Doolittle & Burroughs, L.L.C., Richard B. Fry III, Steven A. Dimengo, and Nathan M. Fulmer, for appellee and cross-appellant.

Dave Yost, Attorney General, Mathura J. Sridharan, Solicitor General, Stephen P. Carney, Deputy Solicitor General, and Daniel G. Kim, Assistant Attorney General, for appellant and cross-appellee.

Dentons, Bingham, Greenebaum, L.L.P., Mark A. Loyd, and Bailey Roese; and Tony Long, in support of appellee and cross-appellant, for amicus curiae, Ohio Chamber of Commerce.

_____